(No. 34296.—

MYRLE V. HORNEY *et al.*, Appellees, *vs.* THE CITY OF SPRINGFIELD, Appellant.

*Opinion filed Nov. 20, 1957—Rehearing denied Jan. 20, 1958.*

SAMUEL C. PATTON, City Attorney, and RICHARD R. GRUMMON, both of Springfield, for appellant.

LONDRIGAN & LONDRIGAN, of Springfield, for appellees.

Mr. CHIEF JUSTICE DAVIS delivered the opinion of the court:

This is an appeal by the defendant, city of Springfield, referred to as the city, from a decree of the circuit court of Sangamon County in an accounting action brought by the plaintiffs, as members of the board of trustees of the police pension fund of that city. The decree ordered that the city account and pay over to the plaintiffs 10 per cent of all fines collected at the police station from persons charged with violating traffic ordinances, and paid by such persons to avoid prosecution, from March 1, 1946, to date. The plaintiffs filed a cross appeal from that part of the court's order which denied their right to an accounting of revenues collected by the city from licenses and permits, and for fines imposed upon members of the police department, during the period. The trial judge certified that the validity of a municipal ordinance was involved and that the public interest required a direct appeal to this court.

The amended complaint alleged, in substance, that section 1 of the Police Pension Fund Act, applicable to cities of not more than 200,000 inhabitants (Ill. Rev. Stat. 1953, chap. 24, par. 892,) required that the city treasurer shall

set aside, *inter alia,* to constitute the police pension fund, 10 per cent of all fines collected for violation of city ordinances, 10 per cent of all revenue collected from licenses, other than those for dogs, and all monies received from fines imposed upon members of the police department for the violation of its rules and regulations; that under the provisions of the act the city is a trustee of the funds designated to be set aside subject to the order of the plaintiffs; that the city, during the fiscal years 1946 through 1955, failed to set aside the funds in the three categories mentioned, but had collected and used such funds for corporate purposes; that demand for an accounting was made and refused, and that the city persisted in its refusal to pay over the amounts required to be paid by it under the act. The complaint then prayed that the city account, as trustee, for all such funds so collected; that it be ordered to pay to plaintiffs all sums, with interest, which it was required, but failed, to set aside, and that plaintiffs have judgment for the total amount due. The city's answer denied all of the allegations of the complaint and set up certain affirmative equitable defenses including *laches* and estoppel.

The evidence established that during the period in question, 10 per cent of all fines for the violation of city ordinances paid to and collected through a justice of the peace or police magistrate were paid into the police pension fund; that since 1943, sums paid and collected at the police station for traffic violations, such as overtime parking, have not been credited to the fund. The evidence further showed that 10 per cent of all monies received by the city for business or occupational licenses were paid to the credit of the pension fund, but that no remittance was made for monies received for various permits; that during the years specified in the complaint, no fines were imposed against a member of the police department in any disciplinary pro-

ceeding; that a policeman, who was found guilty of misconduct, was suspended for a definite period without pay, and that the salary, which was withheld, was not paid into the pension fund. The trial court held that plaintiffs were neither entitled to receive such unpaid and withheld salaries, nor 10 per cent of the revenue derived from city permits authorizing the performance of a specific act to be completed within a short period of time, or for the engagement in a temporary activity; that the unpaid salaries were not "fines" imposed upon members of the police department, and that revenue from permits was not within the meaning of "licenses" as that term is used in the act. The court further found that the traffic penalties enumerated in section 30.166 of the city code, payable thereunder at the city police station, subject to the option of the violator to face court prosecution under sections 30.166 to 30.169 inclusive, were synonymous with "fines" as that term is used in section 1 of the act; that 10 per cent of all such payments should be set apart for the pension fund, and that section 30.167 of the code, providing that the sums so paid shall be delivered to the city treasurer and by him credited to the corporate fund of the city, was in conflict with the act and was invalid.

"An Act to provide for setting apart, formation and disbursement of a police pension fund in cities, villages and incorporated towns," having a population of not less than 5,000 and not more than 200,000 inhabitants was approved June 14, 1909. (Ill. Rev. Stat. 1955, chap. 24, pars. 892-904g incl.) The legislature, from time to time, altered the provisions of the act and particularly section 1 thereof (Ill. Rev. Stat. 1955, chap. 24, par. 892,) relative to sources of revenue for the police pension fund. (Laws of 1911, pp. 163, 164; Laws of 1913, pp. 173, 174.) The amendatory act of 1917 first established the mandatory tax rate that a city must levy for the pension fund. Subsequent

amendments prior to 1949 revised the rate of this annual tax both upward and downward and provided that a city, by ordinance, could limit to not less than $5000 the amount paid into the fund from fines, licenses and such other sources. (Ill. Rev. Stat. 1947, chap. 24, par. 892.) Since 1917 the two principal sources of income for the pension fund have been general taxes and specified percentages of the city's receipts from fines, licenses, and the like. The statute has always treated these two sources of income as interrelated.

The 1949 amendments enacted a new formula for the correlation of these sources of income. The amendments required that a reserve fund of not less than $1000 for each one thousand inhabitants of the city be established and maintained (Ill. Rev. Stat. 1949, chap. 24, par. 904d) ; that the pension fund trustees report the condition of the fund annually to the city council, which "Said report shall be made prior to the meeting * * * held for the purpose of levying of taxes for the year for which such report is made"; that the report of the trustees certify (1) the assets on hand, (2) estimated receipts, and (3) the estimated amount required to pay pensions and other obligations and to establish and maintain the reserve fund. (Ill. Rev. Stat. 1949, chap. 24( par. 904e.) These amendments further required the city council to levy a tax annually on all taxable property at a rate which would produce an amount which, when added to the receipts available from the specified percentage of fines, licenses and all other sources, would equal a sufficient sum to meet the annual requirements of the pension fund under the provisions of this act, and provided that "Such tax shall annually be not more than .05% of the full, fair cash value * * * of all taxable property of any city. * * * *In the event that the pension fund in any year over and above the reserve fund is sufficient to meet all demands of those requiring payment therefrom in*

*such year, the city council* \* \* \* *may dispense with the levy of such tax."* (Italics ours.) Ill. Rev. Stat. 1949, chap. 24, par. 892.

The statutory scheme of the present act is clear and the relationship between taxes and other sources of income is precise. The legislature contemplated that the fund should contain a statutory reserve, plus sufficient sums to meet the estimated obligations for the ensuing year. Since the 1949 amendments, the fund income is to be obtained first from a set percentage of certain municipal licenses, fines and other receipts, and if required and to that extent, it is to be supplemented by the annual tax levy to yield the additional amount necessary to maintain the reserve and meet all annual requirements. Provided that the reserve fund is maintained, lower income from other sources would require higher taxes, and higher income from other sources would permit lower tax levies. The act does not contemplate the accumulation of an operating surplus, but only a specific statutory reserve fund plus sufficient receipts to meet current obligations. The amount of this supplemental levy is, of necessity, dependent upon the status of the reserve fund and the estimated requirements as set forth in the trustees' report.

Despite these requirements, the plaintiffs did not file such reports with the city council. However, since the 1949 amendments to the act, the city council has at all times levied the maximum tax of .05% for the purpose of raising a sufficient sum to meet the annual requirements of the fund.

As a result of this maximum levy from 1950 through 1956, the reserve fund in the amount of $119,646.12 has been maintained, as required by the act, and at no time has its integrity been impaired. It appears from the record that the first deficit in the operating fund occurred in 1955, when the amount paid in pensions increased substantially. The total assets in the fund varied from $116,433 in 1946 to $159,969 in 1956.

In absence of the required statutory reports, the city council here relied on annual audits of the pension fund to determine the necessary levy. These audits did not show anticipated receipts from fines, licenses, and the other sources here in issue, and therefore the levy was not reduced. The plaintiffs acquiesced in this method of setting the annual levy and made no demand for additional funds from other sources until 1954. As a result, the reserve fund was maintained and operating requirements were met by the annual tax levy which did not take into consideration the receipts now claimed and the attendant tax reduction which would have arisen thereby. Now the plaintiffs seek an accounting and recovery of approximately $67,500 to be added to the pension fund, a sum which approaches its estimated tax receipts for 1956. They wrongfully failed to file the annual report and to estimate receipts and expenditures prior to the annual levy, as required by section 18 of the act, and thereby obtained the benefits of the maximum tax levy. Had the amounts of fines, licenses, *et cetera,* about which plaintiffs now complain, been estimated as required in each annual report, such sums would have been deducted from the total sum required for the respective year and the tax levy for such year would have been decreased correspondingly. In view of these facts, we are faced at the outset with the question of plaintiff's right to equitable relief.

The maxim that "He who seeks equity must do equity" expresses the governing principle that every action of a court of equity, in determining rights and awarding remedies must be in accordance with conscience and good faith. In the broad sense it may be regarded as the foundation of all equity, but in the administration of justice, courts of equity refine its meaning. Yet where the equitable right of one party is correlated to the rights of the other party arising out of the same subject matter, the maxim applies. The principle is based upon the preservation of reciprocal equi-

ties, and involves the theory that no man can claim inconsistent rights with regard to the same subject matter, or avail himself of its benefits as to part, and defeat its provisions as to other parts. (Pomeroy's Equity Jurisprudence, Fifth ed., vol. 1, secs. 385, 387, and 395; also cf. *Kanauske* v. *Clark,* 388 Ill. 357; *Erlinger* v. *Freed,* 347 Ill. 588; *DeWalsh* v. *Braman,* 160 Ill. 415.) Another segment of general equitable principles is expressed in the related maxim, "Equity aids the vigilant, not those who slumber on their rights." This doctrine operates throughout the entire remedial portion of equity jurisprudence in controlling and restraining courts in administering relief. In discussing its application, Pomeroy quotes the following language of Lord Camden, an eminent English chancellor, in *Smith* v. *Clay,* 3 Brow Ch. 638: "A court of equity which is never active in relief against conscience or public convenience, has always refused its aid to stale demands where the party has slept upon his rights, and acquiesced for a great length of time. Nothing can call forth this court into activity but conscience, good faith, and reasonable diligence." Pomeroy's Equity Jurisprudence, Fifth ed., vol. 1, secs. 418 and 419.

Plaintiffs here claim inconsistent rights in the same subject matter and seek to avail themselves of the benefits of part of the act and defeat other of its correlated provisions. They obtained the maximum tax rate for the years in question through their failure to file the required statutory annual reports. During such years the tax levy should have been reduced by the annual estimated receipts from fines, licenses, and income from other sources. They acquiesced in the procedure followed by the city in levying the maximum tax rate for the years in question and for eight years neglected to assert their alleged claims. Now they seek the aid of a court of equity and pray an accounting of such receipts as they claim were wrongfully withheld by the city.

Plaintiffs have not pursued an equitable course of conduct. The court below should have exercised its discretion to deny an accounting which would effect an immediate double recovery for the trust and thrust a double burden upon the taxpayers. In reality, the redress prayed would not aid the trust, as it would merely reduce the tax levy in ensuing years. In view of these facts, equity requires that the hand of the chancellor be stayed.

Since we have determined that the plaintiffs have no right to an accounting in this proceeding, we are not required to decide whether the receipts set forth in the complaint are "fines" or "licenses" within the meaning of the act.

For the reasons heretofore given the decree of the circuit court of Sangamon County is reversed and the cause is remanded with directions to dismiss the complaint.

*Reversed and remanded, with directions.*