(No. 35135.—)

THE PEOPLE *ex rel.* George E. Mayfield *et al.*, Appellants,
*vs.* THE CITY OF SPRINGFIELD *et al.*, Appellees.

*Opinion filed May 22, 1959.*

LONDRIGAN & LONDRIGAN, of Springfield, for appellants.

WILLIAM P. SHEEHAN, City Attorney, and RICHARD R. GRUMMON, both of Springfield, for appellees.

Mr. JUSTICE DAVIS delivered the opinion of the court:

This is an appeal by the members of the board of trustees of the police pension fund of the city of Springfield, plaintiffs, from the judgment of the circuit court of Sangamon County which dismissed their petition for writ of *mandamus*. In this petition plaintiffs sought to compel the city, its mayor, commissioners and treasurer, defendants, to pay into the police pension fund, commencing March 1, 1958, the following: (1) 10 per cent of all money collected from persons charged with violating traffic ordinances of the city and paid by such persons to avoid prosecution, (2) 10 per cent of all revenue collected from permits authorizing persons to engage in any activity which is illegal without payment of a fee, and (3) 10 per cent of all revenue collected by means of parking meters for the privilege of parking in designated spaces upon the public streets in the city for limited periods of time.

The facts were undisputed and judgment was entered on the pleadings, which consisted of the amended petition for writ of *mandamus,* defendants' answer, and plaintiffs' motion to strike the answer and for judgment upon the pleadings. The trial judge certified that the validity of a municipal ordinance is involved and that the public interest required a direct appeal to this court.

The subject matter of this case was before us in *Horney v. City of Springfield,* 12 Ill.2d 427, where we held that the plaintiffs were not entitled to an accounting of such funds for past years since they had acquiesced in the procedure followed by the city in levying the maximum tax

rate for the years in question and had neglected to assert their claims. Consequently, we did not reach the issues here presented. The plaintiffs have now complied with the pertinent statutes and have demanded that the city pay to them 10 per cent of the moneys above enumerated and defendants have refused to do so.

The material provisions of section 1 of the Police Pension Fund Act are: "* * * All moneys derived from the taxes levied hereunder and the following moneys shall be set apart by the treasurer of such city, village or incorporated town to constitute the police pension fund: * * * 3. 10% of all fines collected for violation of city ordinances. * * * 7. 10% of all revenue collected from licenses by such city, village or incorporated town not heretofore mentioned in this Act." Ill. Rev. Stat. 1957, chap. 24, par. 892.

Section 11 of the act grants to the board of trustees the exclusive control and management of the police pension fund and provides that all moneys due thereto shall be placed by the treasurer of such city, village or town, to the credit of the fund, subject to the order of the board. Section 12 provides that the city treasurer and other city officials who have had the custody or possession of any such pension funds shall make a sworn statement to the board of trustees of such fund, and to the mayor and council of such city, of all moneys received and paid out on account of the pension fund during the year, and of the amount of such funds then on hand and owing to such fund. Ill. Rev. Stat. 1957, chap. 24, pars. 902 and 903.

The challenged section of the municipal ordinance is:

"Sec. 30.167. Same—Receipts for payments; disposition of moneys received.

"Any police officer or city employee designated by the chief of police or commissioner of accounts and finances who shall receive the payment of any sum of money by a violator charged with violating this chapter shall issue to

such person a receipt therefor, bearing his signature and the date of payment. A duplicate receipt, together with the money paid to such officer or other designated person, shall be delivered to the city treasurer and shall be by him credited to the corporate fund of the city."

Plaintiffs contend that "10% of all fines collected for violation of city ordinances," embraces all sums of money collected by the city from persons charged therewith, and that defendants cannot evade this statutory mandate by enacting an ordinance which permits violators to voluntarily pay a fine to designated city officials rather than through the judicial process.

Defendants urge that the words "fine" and "penalty" are not synonymous; that "fine" has a generally accepted and well defined legal meaning, which is a pecuniary punishment imposed by a lawful tribunal upon a person convicted of a crime or misdemeanor, whether in a criminal or civil action; and that the words, "ten per cent of all fines," do not include, nor was there any legislative intent to include voluntary payments made by a person to defendant city for an alleged violation of a city ordinance. Thus, they urge that a money penalty voluntarily paid to a city employee without judicial process for overparking, late payment of a water bill or return of an overdue library book is not a "fine" within the meaning of the act and plaintiffs are not entitled to 10 per cent of these moneys for the pension fund.

The parties litigant are in similar disagreement over the meaning of "revenue collected from licenses" and whether such collections include revenue from permits. Comparatively, the statutory language is old and the ordinances and procedures giving rise to the litigation are new. This presents the problem of applying the aged language of the act to the new and ever-changing conditions of society. While the parties ascribe a different concept or meaning to the words "fines," "penalties," "licenses," and "permits,"

this is more than a controversy over semantics. The function of the judicial process is to dig beneath words and concepts, and, through logic, history, custom, utility, and the standards of right conduct, or one or more of such forces, determine the nature and substance of litigation and the shape and progress of the law. See Selected Writings of Benjamin Cardozo, Nature of the Judicial Process.

One of the questions presented is whether the amounts paid, by persons notified of an alleged traffic violation, constitute "fines" within the meaning of that term as used in section 1 of the Police Pension Fund Act. In 15 Am. Jur., sec. 541, at page 182, it is stated: "The true signification of the word 'fine' when used in a statute must depend somewhat on the context, and the meaning should be gathered from the intention if that can be fairly ascertained from the language used. In general, a fine is a sum of money exacted of a person guilty of an offense as a pecuniary punishment, the amount of which may be fixed by law or left to the discretion of the court. In certain connections the word 'fine' has been held to be synonymous with 'penalty'; but by the great majority of decisions it has been confined to its ordinary meaning."

In *People* v. *Nedrow*, 122 Ill. 363, we held that the words "fines and forfeitures" as used in the Fees and Salaries Act were broad enough to include the penalties referred to in the Pharmacy Act. However, the questions involved were not such as to cause this court to examine the definition of the term "fine" as theretofore generally stated and accepted.

Many jurisdictions have defined the term as pecuniary punishment imposed by a lawful tribunal upon a person convicted of a crime or misdemeanor. *United States* v. *Safeway Stores*, (10th cir.) 140 Fed.2d 834; *Commonwealth* v. *French*, 130 Ky. 744, 114 S.W. 255; *Murphy* v. *State*, 119 Ore. 658, 250 Pac. 834; *Holliman* v. *Cole*, 168 Okla. 473, 34 P.2d 597; *In re Chester School District's*

*Audit,* 301 Pa. 203, 151 Atl. 801; *State* v. *Missouri Pacific Railway Co.* 64 Neb. 679, 90 N.W. 877; *Sinner* v. *State,* 128 Neb. 759, 260 N.W. 275; *State* v. *Providence Gas Co.* 27 R.I. 142, 61 Atl. 44; *Southern Express Co.* v. *Commonwealth ex rel. Walker,* 92 Va. 59, 22 S.E. 809.

Other cases, with slightly varying language, have defined "fine" as a sum of money exacted as a pecuniary punishment from a person guilty of an offense. (*Hanks* v. *Shreveport Yellow Cabs,* (La. App.) 187 So. 817; *Bergman* v. *State,* 187 Wash. 622, 60 P.2d 699; *State* v. *Addington,* 143 N.C. 683, 57 S.E. 398; *Village of Lancaster* v. *Richardson,* (N.Y.) 4 Lans. 136; *Vogel* v. *Corp. Commission of Oklahoma,* 190 Okla. 156, 121 P.2d 586.) These latter decisions, in defining "fine," have not limited the term to punishment imposed by a lawful tribunal. However, they use the words "guilty of" or "convicted of" which indicate that a fine is a penalty paid, after conviction, in response to a determination of guilt. Courts have consistently adopted this restricted meaning of the term "fine."

Plaintiffs have cited *School District of McCook* v. *City of McCook,* 163 Neb. 817, 81 N.W.2d 224, to sustain their position. In that case the school district sought to recover voluntary payments made by a person at the police station for an alleged violation of the city traffic ordinance. Under the provision of the Nebraska constitution, "all fines, penalties and license moneys arising under the rules, by-laws, or ordinances of cities" shall be paid over to the school district. In view of the inclusiveness of the constitutional provision, this case is not helpful in our decision of the case at bar. For similar reasons, the statutes before the courts and the decisions in *McHugh* v. *Placid Oil Co.* 206 La. 511, 19 So.2d 221, and *United States* v. *Atlantic Fruit Co.* (2d cir.) 206 Fed. 440, are not in point.

It is a primary rule of statutory construction that the intention of the legislature should be ascertained and given effect. (*Belfield* v. *Coop,* 8 Ill.2d 293; *Burke* v. *Industrial*

*Com.* 368 Ill. 554.) Such intent is to be sought principally from the language used in the statute, which affords the best means of its exposition, and if ascertainable, will prevail without resorting to other aids for construction. (*American Steel Foundries* v. *Gordon,* 404 Ill. 174; *New National Coal Co.* v. *Industrial Com,* 373 Ill. 468.) When a statute employs a word having a well known legal signification the courts will, in the absence of any expression to the contrary, assume that the legislature intended it to have that signification. *People* v. *Wildeman,* 325 Ill. 99; *People ex rel. Stevenson* v. *Law and Order Club,* 203 Ill. 127; *Siegel* v. *People,* 106 Ill. 89.

Contrary to plaintiffs' contentions, we find nothing in the act in question which indicates that the legislature used the word "fines" in a loose popular sense, or intended it to have a meaning different from its legal meaning. (50 Am. Jur., sec. 278, page 265.) The language in question appeared in the Police Pension Fund Act as adopted in 1909. The ordinance which must be considered in relation to section 1(3) of the act is novel. The question presented did not receive the consideration of the legislature and its intent is elusive. We are now construing this act to determine the meaning of the word "fines." In 1909, it had a restricted meaning and was limited to a penalty paid after conviction of an offense by a lawful tribunal. The defendants are paying over to plaintiffs 10 per cent of such fines, but refuse to remit 10 per cent of the payments voluntarily made by a person to the defendant city for the violation of its traffic ordinance.

The sums paid by persons pursuant to the provisions of section 30.166 of the ordinance are not tantamount to pecuniary punishment imposed upon one guilty or convicted of an offense. When a person, to whom a notice of violation has been issued, elects to pay the designated amount rather than be prosecuted, he does so without an admission of guilt. The person to whom payment is made

has no jurisdiction or authority to receive a guilty plea, determine the guilt of the accused, or pronounce judgment. The fact that the sum is paid for the purpose of avoiding prosecution and possible conviction, with attendant high fines and costs, serves to emphasize that there is no determination of guilt or conviction. The person to whom the notice is given has the alternative of trial. Payment pursuant to the provisions of the notice is not compulsory.

The ordinance makes no provision for the form of notice to be used and any inept language in the notice with reference to fines is not chargeable to the defendant city. It offers a compromise to prosecution, whereby the person notified of an alleged violation may conveniently and inexpensively settle the controversy. Plaintiffs admit that they "cannot recover ten per cent of all penalties such as * * * late filing of licenses, late payment of water bills, penalties for delinquent special assessments or overdue library books," but seek to recover 10 per cent of the traffic violation payments which they characterize as "fines."

The traffic ordinance in question with its pseudo court and hybrid fine-penalty brings a new technique in traffic regulation and enforcement. Our problem is to fit this new procedure into the language and purpose of our statutory enactment of 50 years ago.

The present scheme for the regulation of traffic and the disposition of traffic violations by the voluntary payment of a specified sum for each transgression is like a fine in that it is in the nature of a penalty for disregarding the provisions of a city ordinance; it is unlike a fine in that it is voluntarily paid to avoid prosecution, without an admission of guilt, and is not imposed by a lawful tribunal. The amount to be paid is fixed by ordinance, as are the sums to be paid for late filing of licenses, late payment of water bills, overdue library books and delinquent special assessments, which are designated as penalties.

Without the benefit of more explicit language in the act and in the light of the general meaning of the word "fine" when the act was adopted, we conclude that the amounts received under the provisions of section 30.166 are not fines within the purview of section 1(3) of the act; that the defendant city is entitled to them; and that the requirement of section 30.167 that they be paid into the corporate fund is consistent with the requirements of section 1 of the Police Pension Fund Act.

Plaintiffs also contend that the clause "10% of all revenue collected from licenses * * * not heretofore mentioned in this Act" is broad enough to include revenue collected for licenses to engage in a business, trade, occupation, or profession, fees received from sidewalk, sewer, street-opening, building, plumbing and electrical permits, etc., as well as money deposited in parking meters and collected by the city. The defendants urge that the language refers to money received from licenses to carry on a business, trade, occupation or profession, or subject of a continuing nature, and that the legislature did not intend to include in this provision, fees for special permits and privileges and parking meter receipts.

Plaintiffs state that, in the broad concept, a license is an authority to do something which otherwise would be prohibited, and that the terms "license" and "permit" have been used synonymously by the courts. However, their authorities are not decisive. In *Standard Oil Co.* v. *State Board of Equalization,* 110 Mont. 5, 99 P.2d 229, the validity of a chain store licensing law was involved, and the question presented was whether the fee involved was a "license" or a "real-property tax." Both *People* v. *Monroe,* 349 Ill. 270, and *Wilkie* v. *City of Chicago,* 188 Ill. 444, involved the regulation of a business or occupation by way of license and neither was determinative of the question here presented.

"License" was defined in *State Board of Barber Examiners* v. *Walker,* 67 Ariz. 156, 192 P.2d 723, as a permit granted by the sovereign, generally for a consideration, to a person, firm or corporation to pursue some occupation or to carry on some business subject to regulation under the police power, and the case does not determine that the words "permit" and "license" have the same meaning. In *Pennsylvania Liquor Control Board* v. *Publicker Commercial Alcohol Co.* 347 Pa. 555, 32 A.2d 914, the court construed section 15 of the Pennsylvania Liquor Control Act, found that the entire act was an exercise of police power, that the license fee was charged for the special privilege or authority of manufacturing alcohol, and that it was a regulatory fee and not a tax.

While it is true that an individual pays a fee for the exercise of a privilege, without the payment of which his acts would be unlawful, yet we would not say one who pays a fee and uses a municipal golf course has taken out or obtained a "license" to play golf, or has, by the payment of fee, secured a "license" to swim in the municipal pool. McQuillin recognizes the difference between the terms when he states, "* * * the term 'license' is more commonly employed to designate official municipal authorization of a continuing business or activity while the term 'permit' is more commonly, but not strictly, used to refer to municipal authorization of an act or activity that will be completed, the permit thereof being executed or terminated." 9 McQuillin, Municipal Corporations, 3d ed., p. 8.

The legislature did not expressly include revenue from permits, inspection fees and privilege charges when it provided that "10% of all revenue collected from licenses * * * not heretofore mentioned in this Act" shall be included in the police pension fund. If such charges are to be included in "licenses" it must be on the basis of legislative intent that the term embraces them.

A review of the history of the Police Pension Fund Act reveals that in neither the original act nor in its amendments have the terms "permit" or "inspection fee" been used. (Laws of 1921, p. 311; Laws of 1913, p. 173; Laws of 1911, p. 163 *et seq.;* Laws of 1909, p. 133, *et seq.;* Laws of 1887, p. 122.) The Police Pension Fund Act for municipalities of 50,000 or more (Laws of 1887, p. 122,) provided that: "1. Two per centum of all moneys received from licenses for the keeping of saloons or dram shops. 2. Three-fourths of all moneys received for taxes, or from licenses, upon dogs. * * * 5. One-fourth of all moneys received from licenses granted to pawnbrokers, secondhand dealers and junk stores," and other items listed, should be set apart for the fund.

The Police Pension Fund Act, as amended June 14, 1909, gave to the fund three fourths of the dog licenses, "two per cent of all moneys received from licenses for the keeping of saloons, dram shops and wholesale liquor houses," and "Ten per cent of all revenues collected from licenses * * * not heretofore mentioned in this bill." (Laws of 1909, p. 134.) With the advent of prohibition, the provision relative to money received from licenses for keeping saloons was eliminated by amendment in 1921.

Kindred enactments for both police and fireman pension funds set apart for such funds revenue received from licenses authorizing persons and corporations to engage in any business, profession or occupation. (Ill. Rev. Stat. 1957, chap. 24, pars. 913 and 918.) Thus, we conclude that the legislative policy and intent restricts the meaning of "revenue collected from licenses" to licenses authorizing persons or corporations to engage in a business, trade, profession or occupation. The statute contains one exception which is expressly stated, "Three-fourths of all moneys received for licenses upon dogs." Ill. Rev. Stat. 1957, chap. 24, par. 892(1).

We have heretofore explicitly rejected the theory that parking meter receipts are a license fee or a tax. The fees deposited in the meters are used to pay the costs of installing and maintaining the meters, and of supervising and enforcing the restrictions on parking. (*City of Bloomington* v. *Wirrick,* 381 Ill. 347, 359.) Parking meters were nonexistent when the police pension fund legislation was enacted and obviously the legislature did not contemplate their advent or classify the revenue to be received from their use. Yet the language of the act has remained substantially unchanged even after their use became prevalent. It is now common knowledge that they exist and, where used, provide an item of revenue, which is frequently pledged to pay principal and interest on revenue bonds for parking facilities. Ill. Rev. Stat. 1957, chap. 24, pars. 52.1—1 *et seq.*

Section 1 of the Police Pension Fund Act provides eight sources of revenue for the police pension fund, in addition to taxes. At one time the section specified eleven such sources. (Laws of 1911, pp. 163, 164.) The proceeds from the sale of lost or stolen property and fines for carrying concealed weapons were then included in, and later omitted from, the fund. (Laws of 1913, pp. 173, 174.) In 1913, deductions from pensions paid were added as a source of income, but this item was subsequently excluded. These, and other changes, sufficiently illustrate that the legislature has altered the specified sources of income for the fund whenever it appeared necessary or desirable, but that revenue from parking meters has never been included. Had the legislature desired to apply this source of municipal income to the benefit of the pension fund, we believe that it would have so stated.

For the reasons heretofore given, the petition for *mandamus* was properly dismissed, and the judgment of the circuit court of Sangamon County is affirmed.

*Judgment affirmed.*