Opinion filed May 25, 2023

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2023

| | | |
|---|---|---|
| *In re* APPLICATION OF THE COUNTY TREASURER AND *ex officio* COUNTY COLLECTOR, for Order of Judgment and Sale Against Real Estate Returned Delinquent for Nonpayment of General Taxes and Special Assessments for the Year 2015 and Prior Years | ) ) ) ) ) ) ) ) ) | Appeal from the Circuit Court of the 12th Judicial Circuit, Will County, Illinois, <br><br> Appeal No. 3-22-0226 <br> Circuit No. 16-TX-297 |
| (DG Enterprises, LLC-X, LLC, Petitioner-Appellant v. Deborah Thomas, Respondent-Appellee). | ) ) ) | Honorable <br> John C. Anderson, <br> Judge, Presiding. |

_____

JUSTICE DAVENPORT delivered the judgment of the court, with opinion.
Presiding Justice Holdridge and Justice Peterson concurred in the judgment and opinion.

_____

**OPINION**

¶ 1     Petitioner DG Enterprises, LLC-X, LLC (DG Enterprises) appeals from the circuit court's order granting respondent Deborah Thomas's second amended motion to vacate the court's prior order directing the county clerk to issue a tax deed to DG Enterprises. We must determine whether the court erred when it determined DG Enterprises did not properly publish notice under section 22-20 of the Property Tax Code (Code) (35 ILCS 200/22-20 (West 2018)). For the following reasons, we reverse.

## I. BACKGROUND

### A. The Property

Thomas owned the property at issue, which is located in Crete, Illinois, a municipality in eastern Will County, a county with approximately 700,000 inhabitants.[1] *QuickFacts, Will County, Illinois*, U.S. Census Bureau, https://www.census.gov/quickfacts/fact/table/willcountyillinois/PST045222 (last visited May 16, 2023) [https://perma.cc/7DAK-WF3Z].

### B. The 2016 Tax Sale

Thomas did not pay the real estate taxes due for the 2015 tax year. On November 29, 2016, at the annual county tax sale, Old School Investments purchased the delinquent taxes, triggering a two-year, six-month redemption period that expired on May 29, 2019. 35 ILCS 200/21-350(b) (West 2018). Old School Investments delivered notice of the sale to the county clerk, who mailed the notice to Thomas. *Id.* § 22-5. Old School Investments later assigned its certificate of purchase to DG Enterprises, and DG Enterprises extended the redemption period to November 6, 2019. See *id.* §§ 21-250, 21-385.

### C. DG Enterprises's Petition

On May 8, 2019, DG Enterprises petitioned for an order directing the county clerk to issue a tax deed. DG Enterprises asserted it was entitled to the deed if Thomas failed to redeem by the November 6, 2019, deadline. See *id.* § 22-30. DG Enterprises endeavored to serve a "take notice" (*id.* § 22-10) via (1) personal service or certified mail, by the sheriff, on the known parties (*id.* § 22-15), (2) publication as to the known and any unknown parties (*id.* § 22-20), and (3) certified mail, by the circuit clerk, to the known parties (*id.* § 22-25).

---

[1]A court may take judicial notice of population figures. *System Development Services, Inc. v. Haarmann*, 389 Ill. App. 3d 561, 575 (2009).

¶ 9        On May 23, 2019, the circuit clerk mailed the take notice. The sheriff personally served Thomas with the take notice on June 3, 2019, and served the other known parties in accordance with the Code.

¶ 10        With regard to the publication requirement, DG Enterprises placed the take notice in the Herald-News, which published it on June 12, 13, and 14, 2019. The record contains a certificate of publication from the Herald-News's publisher, Shaw Media, Inc., certifying the Herald-News is "published in the City of Joliet, County of Will, State of Illinois, is of general circulation throughout the county and surrounding area, and is a newspaper as defined by [section 5 of the Notice By Publication Act (715 ILCS 5/5 (West 2018))]." Shaw Media also certified the notice's publication on "a statewide public notice website as required by [section 2.1 of the act (*id.* § 2.1)]."

¶ 11                                D. DG Enterprises's Application

¶ 12        Thomas did not redeem by the deadline. Accordingly, on November 7, 2019, DG Enterprises applied for an order on its petition. DG Enterprises attached to its application an affidavit from its attorney, who averred, in relevant part, DG Enterprises had complied with the Code's notice requirements, including that it caused the take notice to be published in the Herald-News on June 12, 13, and 14, 2019.

¶ 13                        E. The Hearing on DG Enterprises's Petition and Application

¶ 14        On November 8, 2019, the circuit court held a hearing on DG Enterprises's petition and application. Thomas appeared *pro se*. During the hearing, the court asked Thomas whether she had "any legal basis" to object to the issuance of the tax deed. Thomas responded, "No." While explaining its position, DG Enterprises told the court it had published notice in the Herald-News, which it described as "a paper of general circulation in Crete." The court asked, "Is the Herald News really a newspaper of general circulation in Crete?" In response, DG Enterprises told the

3

court, "There is not any other paper out there." The court disagreed, noting "[t]hat's actually not true" because there were "small weekly" newspapers that circulated in that area. The court, however, said whether publication was proper was not an issue for it to raise. Accordingly, it entered an order directing the county clerk to issue DG Enterprises a tax deed. In its order, the court found "all notices, as required by law, ha[d] been duly given"; DG Enterprises "ha[d] complied with all the provisions of law entitling [it] to a Tax Deed"; and DG Enterprises "ha[d] complied strictly and fully with the provisions of the [Code]."

¶ 15 On November 12, 2019, DG Enterprises took out the deed and recorded it as document No. R2019080920. See 35 ILCS 200/22-85 (West 2018).

¶ 16 F. Thomas's Motion to Vacate

¶ 17 Thomas retained an attorney and, on December 5, 2019, moved to vacate the order. She asserted the publication of notice in the Herald-News did not comply with section 22-20 of the Code, which reads, in part, as follows:

> "If the property is located in a municipality in a county with less than 3,000,000 inhabitants, the purchaser or his or her assignee shall also publish a notice as to the owner or party interested, in some newspaper published in the municipality. *** [I]f no newspaper is published therein, *** the notice shall be published in some newspaper in the county." *Id.* § 22-20.

According to Thomas, the Vedette, unlike the Herald-News, was published in Crete. Therefore, Thomas asserted, DG Enterprises should have published the notice in the Vedette, not the Herald-News.

¶ 18 Thomas attached an affidavit from Chris Russell, who owns the Vedette. Russell averred the Vedette (1) is "located" in Peotone, Illinois, (2) "is a secular newspaper, which newspaper

4

offers the services of legal publication notices," (3) "has continuously published at regular intervals of at least once each week with a minimum of fifty issues per year," (4) "has so published for at least one year prior [to] May 8, 2019," and (5) "publishes and circulates in Crete, Illinois." She also attached two documents, purportedly from Shaw Media but which were not authenticated: a "publication map" and a listing of their distribution zones. Both documents indicated the Herald-News was not distributed in Crete.

¶ 19                          G. DG Enterprises's Response

¶ 20        DG Enterprises argued its publication of the notice in the Herald-News complied strictly with the plain language of section 22-20. Specifically, it asserted the Vedette was published in Peotone, not Crete. And because no newspaper was published in Crete, the notice could be properly published in any newspaper published in the county. In support, DG Enterprises attached (1) an affidavit from Don Craven, an attorney who serves as the Illinois Press Association's (association) general counsel, (2) a form the Vedette submitted to the association in connection with to its membership, and (3) a transcript of Russell's deposition.

¶ 21                          1. *Craven's Affidavit*

¶ 22        Craven averred that the association designed and administers a statewide website where, under section 2.1 of the Notice By Publication Act (Publication Act), newspapers must place legal notices. 715 ILCS 5/2.1 (West 2018). As part of its website administration, the association requires each newspaper that intends to use the website to submit a form that contains information about the newspaper, including its "point of publication." According to Craven, the supreme court had defined "published in" as the place where the paper is first printed or issued for distribution, recognized a distinction between publication and circulation, and rejected the notion that the simultaneous circulation of different editions of a newspaper in various townships did not serve to

5

make them "published in" those townships. See *North Shore Savings & Loan Ass'n v. Griffin*, 75 Ill. 2d 166, 170-72 (1979); *Garcia v. Tully*, 72 Ill. 2d 1, 11-14 (1978).

¶ 23        Craven averred that, on the required form, the Vedette stated that it was first made available in Peotone. The association had not received a form from any newspaper "claiming to be first made available to the public in Crete."

¶ 24                                    2. *The Form Submitted by the Vedette*

¶ 25        The form the Vedette submitted to the Illinois Press Association instructed its preparer that the information provided was "critical to make a correct determination of which notices your newspaper is eligible to publish." Thus, it directed the preparer to "review the questions carefully and consult legal counsel if [he or she] wish[ed]." It further stated the information provided "should match the information you include in your Certificate of Publication." On the form, the Vedette certified it was "first made available to the public" in Peotone. Under the response, the form stated, "This will define the point where your newspaper is 'published in' according to Illinois law."

¶ 26                                    3. *Russell's Deposition*

¶ 27        In his deposition, Russell testified that the Vedette has only one office, which is located in Peotone. The Vedette is one newspaper but distributes three different editions: a Peotone edition, a Manteno edition, and an eastern Will County edition. The eastern Will County edition serves Crete, Monee, and Beecher. The editions are not "standalone" newspapers; rather, each contains several common pages in addition to stories and information tailored to the communities served by the edition. Any legal notices published in the Vedette are printed in all three editions.

¶ 28        In 2019, all editions of the Vedette were printed in Lansing, Illinois. At the time, Russell would pick up the newspapers in Lansing and drop off some copies at grocery stores, gas stations, and convenience stores—first in Crete and then in Beecher—on his way back to Peotone. Once in

6

Peotone, Russell labeled the papers and took them to the Peotone post office for distribution to subscribers. The Vedette's individual subscribers in Crete would receive their copies in the mail via the Peotone post office.

¶ 29　　　　Russell testified the Vedette was a member of the association and acknowledged it had submitted the form stating it was "published in" Peotone. Russell's brother, who is no longer affiliated with the Vedette, prepared the form.

¶ 30　　　　DG Enterprises's attorney also asked Russell about the affidavit attached to Thomas's motion. Russell testified he did not prepare the affidavit; rather, Thomas or her attorney prepared it and gave it to him to sign. When asked to explain his statement in the affidavit that the Vedette "publishes and circulates in Crete," Russell said he believed the terms "publishes" and "circulates" are similar and he had not given much thought as to whether they were distinct concepts. Russell signed the affidavit with the understanding that the Vedette was published in all the communities it served, that is, Peotone, Manteno, Beecher, Monee, and Crete.

¶ 31　　　　　　　　　　H. The Hearing on Thomas's Motion to Vacate

¶ 32　　　　On May 20, 2021, the circuit court held a hearing on Thomas's second amended motion to vacate. At the outset, the court stated it knew the Herald-News did not "deliver for subscribers to Crete" and the primary issue was whether "Crete is in the Herald[-]News'[s] circulation area." DG Enterprises asserted the question was not whether the Herald-News circulates in Crete but, rather, whether any newspaper was published in Crete. According to DG Enterprises, if no newspaper was published in Crete, it was permitted to publish in any newspaper in the county. The court asked, "So you're saying that the dispositive question is how do you define publish? Does it mean circulation or does it mean that's where they actually print the paper?" DG Enterprises's attorney

7

responded affirmatively. After hearing the parties' arguments, the court took the matter under advisement, telling the parties it would mail its order to them.

¶ 33                                     I. The Circuit Court's Order

¶ 34        On May 26, 2021, the circuit court granted Thomas's motion in a written order. Relying on *People ex rel. City of Chicago Heights v. Richton*, 43 Ill. 2d 267 (1969), and *Second Federal Savings & Loan Ass'n v. Home Savings & Loan Ass'n*, 60 Ill. App. 3d 248 (1978), the court determined "published," as used in section 22-20 of the Code, meant "to make public[ ] or to make known to people." It explained this interpretation was consistent with the statute's purpose—that is, "to provide actual or, at least, constructive notice to people who could be impacted by the controversy."

¶ 35        Additionally, the court explained DG Enterprises's position would lead to "strange consequences." First, "in the context of a tax case for a property in Joliet, but also *** in the context of a name change or some other notice," notice published in the Chicago Tribune or Chicago Sun-Times would be ineffective if those newspapers were not "mailed from a Joliet post office or somehow put into a delivery platform that is physically *in Joliet*." (Emphasis in original.) The court apparently believed publication in those newspapers would be proper in a tax-sale case involving a property in Joliet. Second, DG Enterprises's interpretation would require "parties *** to start investigating the mail location and delivery systems for newspapers before publishing notices."

¶ 36        The court ultimately determined there were newspapers published in Crete—namely, the Vedette, the Chicago Tribune, and the Chicago Sun-Times. It further determined, based on a market map it found on Shaw Media's website, which did not include Crete, the Herald-News was

8

not published in Crete and provided no meaningful notice to residents of Crete.[2] According to the court, "[t]he Northwest Indiana Times would be more likely consider [*sic*] 'published' in Crete before the Herald News would be."

¶ 37    Neither party received the court's order, and on February 1, 2022, DG Enterprises filed an agreed motion to vacate and reenter the May 26, 2021, order. The court granted the motion. On March 21, 2022, Thomas tendered to DG Enterprises a cashier's check for $15,684.87. See 35 ILCS 200/22-80(b) (West 2020). DG Enterprises rejected the tender to preserve its appeal rights. See *In re Application of the County Treasurer & ex officio County Collector of Lake County*, 351 Ill. App. 3d 244 (2004). With the court's permission, DG Enterprises placed the check with the circuit clerk. The court entered a final order vacating its prior order directing the county clerk to issue a tax deed (see 35 ILCS 200/22-80(b) (West 2020)), and this appeal followed.

¶ 38                                    II. ANALYSIS

¶ 39    On appeal, DG Enterprises contends the circuit court erred when it vacated its order directing the clerk to issue the tax deed. Specifically, it argues no newspaper was published in Crete, and under section 22-20 of the Code, it could publish "in some newspaper in the county," including the Herald-News.

¶ 40                              A. Standard of Review

¶ 41    This appeal arises out of the circuit court's grant of a motion to vacate under section 2-1203 of the Code of Civil Procedure. 735 ILCS 5/2-1203 (West 2018); see 35 ILCS 200/22-45 (West 2018) (tax deeds are incontestable except by appeal; however, relief may also be sought

---

[2]It appears the circuit court accessed the webpage it cited (Shaw Media Marketing, https://www.shawmediamarketing.com/wp-content/uploads/2021/03/Local-News-Network-Icon-5x5-1.png (last visited May 18, 2023) [https://perma.cc/FV4C-99YV]) in 2021. The market map does not indicate when it was prepared or whether it accurately showed the Herald-News's market when publication was made, in 2019.

9

under sections 2-1203 or 2-1401 of the Code of Civil Procedure (735 ILCS 5/2-1203, 2-1401 (West 2018)). When reviewing such orders, we may not disturb the order unless the court abused its discretion. See *Cable America, Inc. v. Pace Electronics, Inc.*, 396 Ill. App. 3d 15, 24-25 (2009). Under this standard, we may reverse when the circuit court applies an incorrect legal standard in making its decision. *In re Marriage of Chapa*, 2022 IL App (2d) 210772, ¶ 36.

¶ 42        However, our review is *de novo* insofar as this appeal requires us to construe section 22-20 of the Code. *In re Application of the County Treasurer & ex officio County Collector of Lake County*, 2022 IL App (2d) 210689, ¶ 38; see *People ex rel. Graf v. Village of Lake Bluff*, 206 Ill. 2d 541, 549 (2003) ("Since we must construe the subject statutes to determine whether the trial court applied the correct legal criteria in the exercise of its discretion, a question of law is presented, and our review is *de novo*."). In construing the statute, our primary objective is to determine and give effect to the legislature's intent. *Application of the County Treasurer*, 2022 IL App (2d) 210689, ¶ 38. "We are guided by the statute's language, which is the best indication of that intent, and we must apply the statute as written, giving the words used their plain and ordinary meaning." *Id.* However, "[w]hen a statute employs words *** which have well-known legal significance, absent any contrary expression, courts assume that the legislature intended the words to have that meaning." *People v. Warren*, 173 Ill. 2d 348, 370 (1996); *People ex rel. Mayfield v. City of Springfield*, 16 Ill. 2d 609, 615 (1959). Further, we will not add to nor depart from the statute's plain language by reading into it exceptions, limitations, or conditions that the legislature did not express. *Application of the County Treasurer*, 2022 IL App (2d) 210689, ¶ 38. And we must avoid a construction that reduces any word or phrase in the legislation to surplusage. *In re Application of the County Collector of Kane County*, 132 Ill. 2d 64, 72 (1989).

¶ 43                              B. The Relevant Provisions of the Code

10

¶ 44        Section 22-10 of the Code requires the tax purchaser to give notice of the redemption period's expiration "to the owners, occupants, and parties interested in the property" and sets forth the form and timing of the required notice. 35 ILCS 200/22-10 (West 2018). This notice is commonly referred to as a "take notice" and must, among other things, identify the property by legal description or property index number, state the date the redemption period expires, advise that a petition asking for a tax deed has been filed, and state the date on which the circuit court will hear the petition. *Id.*

¶ 45        Section 22-15 of the Code requires the tax purchaser (or his or her assignee) to give the take notice "by causing it to be published in a newspaper as set forth in [s]ection 22-20." *Id.* § 22-15. In addition, the sheriff (or licensed private detective) must serve the property owners who reside on the property "by leaving a copy of the notice with those owners personally." *Id.* As to "all other owners and parties interested in the property" and nonowner occupants who can be found in the county, the sheriff must serve the take notice as set forth in the Code of Civil Procedure (735 ILCS 5/2-203, 2-204, 2-205, 2-205.1, 2-211 (West 2018)). 35 ILCS 200/22-15 (West 2018). The sheriff, however, may serve an owner or interested party that cannot be found or served in the county by mailing the take notice to that party by registered or certified mail, return receipt requested. *Id.* In addition, the tax purchaser must cause the circuit clerk to mail the take notice, signed by the circuit clerk, to the property owners and occupants who are entitled to service. *Id.* § 22-25.

¶ 46        Thus, the Code requires the tax purchaser to give the take notice by three separate means: (1) service by publication in accordance with section 22-20, (2) service by the sheriff in accordance with section 22-15, and (3) certified mail by the circuit clerk in accordance with section 22-25.

11

¶ 47        Here, the parties dispute whether DG Enterprises's publication of the notice in the Herald-News complied with section 22-20 of the Code; they do not dispute DG Enterprises otherwise complied with the notice provisions set forth above. Accordingly, we turn to the text of section 22-20, which reads, in pertinent part, as follows:

> "If the property is located in a municipality in a county with less than 3,000,000 inhabitants, the purchaser or his or her assignee shall also publish a notice as to the owner or party interested, in some newspaper published in the municipality. If the property is not in a municipality in a county with less than 3,000,000 inhabitants, or *if no newspaper is published therein*, or if the property is in a county with 3,000,000 or more inhabitants, *the notice shall be published in some newspaper in the county*. If no newspaper is published in the county, then the notice shall be published in the newspaper that is published nearest the county seat of the county in which the property is located." (Emphases added.) *Id.* § 22-20.

Crete is a municipality in Will County, a county of less than 3 million inhabitants. Thus, under a plain reading of section 22-20, DG Enterprises was required to publish the take notice in a newspaper that is "published in" Crete. However, if no newspaper is published in Crete, then DG Enterprises was required to publish the take notice "in some newspaper in the county." Accordingly, this case turns on the meaning of "published in."

¶ 48                            C. "Published In"

¶ 49        The Code does not define "publish" or "published in," and, to our knowledge, no court has construed the phrase as used in section 22-20. Several courts, however, have construed the phrase as used in other statutes, and, until 1978, two differing definitions were used.

¶ 50        Some courts defined the phrase as "the place where the newspaper is first issued or printed, to be sent out by mail or otherwise." *Polzin v. Rand, McNally & Co.*, 250 Ill. 561, 575 (1911); see also *People ex rel. O'Connell v. Read*, 256 Ill. 408, 410 (1912) ("Published in" means "the place where [the newspaper] is first put into circulation—where it is first issued to be delivered or sent, by mail or otherwise, to its subscribers.").

¶ 51        Other courts defined the phrase as " 'to make known.' " *Perkins v. Board of County Commissioners of Cook County*, 271 Ill. 449, 475 (1916); see *Richton*, 43 Ill. 2d at 271 ("[T]he word 'published' as used in section 6-17 of the Election Code [(Ill. Rev. Stat. 1967, ch. 46, ¶¶ 1-1 *et seq.*)] is not synonymous with the word 'printed' but means to make public or to make known to people by newspapers of general circulation."); *Second Federal*, 60 Ill. App. 3d at 254 (Under *Richton*, the "clear" meaning of "publish[ed]" when used in a notice provision is "to make public or to make known to people by newspapers of general circulation." (Internal quotation marks omitted.)).

¶ 52                              D. *Garcia* and *Griffin*

¶ 53        In 1978, the supreme court decided *Garcia*. There, the defendant contended the newspaper became "published" once delivered or issued to its readership. Emphasizing the paper was made simultaneously available in the four townships at issue, the defendant argued it was published in all four townships. *Garcia*, 72 Ill. 2d at 12. The supreme court rejected the defendant's contention, first finding the legislature had distinguished "the 'publication' of a newspaper and its 'general circulation.' " *Id.* The court next examined *Polzin* and *Read* and noted those cases had rejected the notion that a newspaper's circulation in the district complied with the requirement that a newspaper be published in the district. *Id.* at 12-14. Relying on the "clearly drawn statutory distinction between a newspaper's being 'published' and 'circulated,' " the court held "simultaneous

13

circulation of [the defendant's] newspapers in the townships involved does not serve to make them newspapers published within the township." *Id.* at 14.

¶ 54      In *Griffin*,[3] the supreme court considered whether notice of the defendant savings and loan association's relocation was properly published under the Illinois Savings and Loan Act (Ill. Rev. Stat. 1975, ch. 32, ¶¶ 701 *et seq.*). The legislation required publication to be published " 'at least once both in the community of the proposed new location and in the community of the present location.' " *Griffin*, 75 Ill. 2d at 168 (quoting Ill. Rev. Stat. 1975, ch. 32, ¶ 744(h)). Additionally, the legislation defined "published" as " 'printed in the American language in a newspaper of general circulation published in the community in which the association's business office is located, or if no such newspaper exists in that community, then in the county in which such business office is located.' " *Id.* at 168-69 (quoting Ill. Rev. Stat. 1975, ch. 32, ¶ 710.17). The defendant association applied to relocate its business office from Downers Grove to Waukegan and published notice in the Chicago Daily News, which according to the certificate of publication in the record, was "a newspaper published in the city of Chicago, County of Cook and State of Illinois."

¶ 55      The "precise issue" before the supreme court was the "meaning of the phrase 'published in the community' within the context of the Illinois Savings and Loan Act." *Id.* at 169-70. The court noted that, before its decision in *Garcia*, there was no total unanimity as to how "published in" should be construed in various notice statutes. *Id.* at 170 (directing a comparison of *Polzin* and *Read* with *Perkins* and *Richton*). Relying on *Garcia*, *Polzin*, and *Read*, the court wrote the following:

---

[3]The supreme court decided *Griffin* less than 10 months after *Garcia*.

14

"[W]e hold that the requirement in the Illinois Savings and Loan Act that an association's proposal to relocate its business office be printed in 'a newspaper of general circulation published in the community' of the proposed new location and in the community of the present location requires placement of the notice in newspapers first issued or printed for distribution in the communities or counties involved. Therefore, under the facts of the present case, in order to constitute valid notice, there must be publication in newspapers first printed or issued for distribution in Downers Grove and Waukegan unless there are none, in which event publication would have to be in newspapers first printed or issued for distribution in the counties (Du Page and Lake) involved." *Id.* at 172.

¶ 56    Thus, *Griffin* made clear what may not have been clear at the time the supreme court decided *Garcia*: in the context of notice statutes, the phrase "published in" means the place where the newspaper is first issued or printed for distribution. Additionally, *Griffin* made clear that "published" and "circulated" have distinct meanings when used in notice statutes and a newspaper's circulation or distribution in a particular location does not equate to it being published in that location. In other words, the case law demonstrates that, in the context of statutory notice provisions, a newspaper is published in only one location and that location is where a newspaper is first issued or printed for distribution.

¶ 57                                    E. This Case

¶ 58    Here, the circuit court rejected the supreme court's analysis in *Garcia* and *Griffin* and, instead, relied on *Richton* and *Second Federal* in determining the phrase "published in" as used in section 22-20 of the Code meant "to make public or to make known." Using this definition, the

15

court determined the publication in the Herald-News did not comply with section 22-20 because the Herald-News—unlike the Vedette, the Chicago Tribune, and the Chicago Sun-Times—was not published in Crete. The court's determination, however, was based on an incorrect legal conclusion regarding the meaning of "published in."

¶ 59    In light of *Garcia* and *Griffin*, the phrase "published in," as used in section 22-20, means the place where the newspaper is first issued or printed for distribution. Section 22-20 contains no indication the legislature intended that legally significant phrase to have a different meaning in this statute. See *Warren*, 173 Ill. 2d at 370. Any doubt as to the meaning of "published" or "published in," when used in statutory notice provisions, was dispelled when the supreme court, in quick succession, decided *Garcia* and *Griffin*. Both cases rejected the construction of the phrase adopted in *Richton* and *Second Federal* and by the circuit court and Thomas in this case. *Griffin* specifically noted the lack of "total unanimity" in the case law and determined the phrase should be construed to mean the place where the newspaper is first issued or printed. See *Griffin*, 75 Ill. 2d at 170 (directing a comparison of *Polzin* and *Read* with *Perkins* and *Richton*). Admittedly, *Garcia* and *Griffin* limited their analyses to the statutory provisions at issue in those cases. We see no reason, however, why the phrase should be construed any differently in this particular context.

¶ 60    The construction adopted in *Polzin*, *Read*, *Garcia*, and *Griffin*—and which we reinforce here—gives effect to the entirety of section 22-20. See *Application of the County Collector of Kane County*, 132 Ill. 2d at 72. Section 22-20 contains two successive alternatives for publication when there is no newspaper published in the municipality. In such cases, section 22-20 first directs the petitioner to publish the take notice "in some newspaper in the county." 35 ILCS 200/22-20 (West 2018). But if no newspaper is published in the county, then the petitioner must publish the take notice "in the newspaper that is published nearest the county seat of the county in which the

16

property is located." *Id.* The construction advanced by Thomas and adopted by the circuit court—that a newspaper is published where its contents are made public or made known—would reduce to surplusage the statute's alternative publication provisions. Indeed, if a newspaper is published in every municipality in which its contents are made public or made known, then the alternatives would be unnecessary, "since, presumably, at least one newspaper *** is 'made known' in every [municipality] in the State." *Griffin*, 75 Ill. 2d at 171. Stated differently, under the circuit court's construction of section 22-20, and as it in fact found in this case, the petitioner could place the take notice in a nonlocal newspaper with a general circulation throughout the state to notify residents in the affected municipality. See *id.* Such a result conflicts with the clear intent of the legislature: notice of tax-deed proceedings should be given on the most local level possible, increasing the likelihood that local residents will become informed of a pending action. *Id.* Thus, section 22-20 places emphasis on the location of the newspaper's publication—that is, where it is first printed or issued for distribution—rather than the reach of its circulation.

¶ 61 The circuit court's written order and its comments on the record demonstrate the circuit court conflated the distinct concepts of a newspaper's being published and being circulated. At the outset of the hearing on Thomas's motion to vacate, the court stated the primary issue was whether Crete was in the Herald-News's circulation area. And in its order, the court found two papers with statewide circulation were published in Crete. It is well-settled, however, that a newspaper's publication and circulation are distinct concepts. See *Garcia*, 72 Ill. 2d at 12. Indeed, this state's general publication statute, the Publication Act, recognizes the distinction. See 715 ILCS 5/5 (West 2018) (providing that, when notices are required to be published in a newspaper, the publication shall be in a secular newspaper of general circulation published in the city, town, or county; but if

17

no newspaper is published there, then a notice shall be published in a paper that is "published in an adjoining county *having general circulation within the city or town*" (emphasis added)).

¶ 62 Here, the circuit court, using a flawed construction of "published in," determined DG Enterprises's publication in the Herald-News did not comply section 22-20. The certificate of publication in the record establishes DG Enterprises published the notice "in some newspaper in the county" (because Joliet is in Will County). 35 ILCS 200/22-20 (West 2018). Thus, to succeed on her motion to vacate, Thomas had to establish there was, in fact, a newspaper published in Crete. See *Kalmin v. Varan*, 2021 IL App (1st) 200755, ¶ 35 (recognizing the party moving for reconsideration has "the burden of establishing sufficient grounds to prevail" on the motion). The court determined three newspapers were published in Crete—namely, the Vedette, the Chicago Tribune, and the Chicago Sun-Times.

¶ 63 Initially, we briefly address and reject the court's finding that the Chicago Tribune and the Chicago Sun-Times were published in Crete. Thomas never presented any evidence or raised any argument concerning those newspapers, and the record contains no evidence from which the circuit court could conclude they were published in Crete. It is not clear what prompted the court to make this finding, other than perhaps its unstated understanding that those papers were circulated throughout the state, including Crete. In any event, these Chicago-based newspapers fail to meet the requirement of being first printed or issued for distribution in Crete.

¶ 64 We now turn our focus to the circuit court's determination that the Vedette was published in Crete. Thomas raises two points in support of the circuit court's finding. First, she points to Russell's affidavit, wherein he stated, without explanation, the Vedette "publishes and circulates in Crete." On this basis alone, she argues, the court could find the Vedette was published in Crete. We reject this contention. Russell's deposition testimony casts significant doubt on, if not

18

positively rebuts, his conclusion that the Vedette was "publishe[d] and circulate[d] in Crete." Russell testified he made that statement without an understanding of the well-settled distinction between a newspaper's being published and circulated; rather, he believed a newspaper was published in all the communities it served. Under his understanding, the Vedette was published in several different communities, including Crete, Monee, Beecher, Peotone, and Manteno. See *Read*, 256 Ill. at 410-11 (discounting a witness's testimony where the witness "evidently understood that the paper was published in any community where it was generally circulated").

¶ 65 Second, Thomas argues the Vedette was published in Crete under the definition set forth in *Griffin* because it was the first place the newspapers were distributed after pickup from the printer in Lansing. To accept this argument would require us to ignore the settled definition of "published in" and overlook the compelling evidence that the Vedette was in fact *published* in Peotone and *circulated* in Crete. Thomas relies on Russell's deposition, wherein he explained that, after picking up the newspapers from the printer in Lansing, he dropped off papers at grocery stores and convenience stores, first in Crete, on his way back to the Vedette's office in Peotone, where the papers were labelled and placed into the mail for distribution to the Vedette's individual subscribers.

¶ 66 However, Russell averred the Vedette was "located" in Peotone, a fact he confirmed during his deposition when he testified the Vedette's sole office was located in Peotone. He also testified that the Vedette distributed the newspaper to its individual subscribers via the Peotone post office. Additionally, the association requires its members to submit a form as part of the association's administration of the statewide public notice website (see 715 ILCS 5/2.1 (West 2018)). On its form, the Vedette stated its "point of publication" was in Peotone. The form advised the Vedette that its statement would "define where [its] newspaper [was] 'published in' according to Illinois

19

law," and Russell's brother signed it, certifying that "the circulation information" it had provided was true and accurate. Further, Craven averred that he had reviewed the association's records and none of its members claimed to be published in Crete. Simply put, the evidence in this case established the Vedette was not published in Crete and that no other paper was there published.

¶ 67        Further, to accept Thomas's assertion would lead to absurd and inconvenient results when applying section 22-20. See *Palm v. Holocker*, 2018 IL 123152, ¶ 21. Tax-deed petitioners would be required to inquire with newspaper publishers to ascertain where any given newspaper was first delivered on any given day, and a newspaper's publication location could change on a whim. Such a construction would be unworkable and could not have been intended by the legislature.

¶ 68        Finally, we acknowledge the circuit court's concern that the Herald-News may not have been circulated in Crete when the notice was published. However, the sole support that conclusion finds in the record are the two unauthenticated, unexplained documents, purportedly from Shaw Media, that Thomas attached to her motion to vacate and the webpage that the circuit court accessed in 2021 (that is, two years after the publication was made). Even if we assume the documents and website definitively showed the Herald-News did not circulate in Crete at the time of publication, we find that fact insignificant in light of the clear language of the statute.

¶ 69        We appreciate that the published notice in this case may not have reached any person in the affected municipality, which would appear contrary to the purpose of a publication statute. But here, the legislature determined that, when no newspaper is published in a municipality, notice in "some newspaper in the county" would give sufficient notice to affected persons, regardless of where that paper is distributed. Indeed, had the legislature intended that the county newspaper also be circulated in the municipality, it could have said so. See, *e.g.*, 715 ILCS 5/5 (West 2018)

20

(providing, in certain circumstances, a notice may be published in a paper published in an adjoining county, if the paper is generally circulated in the affected municipality).

¶ 70    In sum, we conclude the circuit court erred when it granted Thomas's motion to vacate the order directing the county clerk to issue the tax deed. The record established that no newspaper was published in Crete. Therefore, under section 22-20, DG Enterprises could properly publish the take notice in "some newspaper in the county." DG Enterprises published in the Herald-News, a newspaper of general circulation that is published in Joliet in Will County. Thus, DG Enterprises complied with section 22-20 and was entitled to a tax deed.

¶ 71                              III. CONCLUSION

¶ 72    For the reasons stated, we reverse the judgment of the circuit court of Will County.

¶ 73    Reversed.

*In re Application of the County Treasurer & ex officio County Collector*,
**2023 IL App (3d) 220226**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Will County, No. 16-TX-297; the Hon. John C. Anderson, Judge, presiding. |
| **Attorneys for Appellant:** | David R. Gray Jr., of Gray Law Offices, Inc., of Chicago, for appellant. |
| **Attorneys for Appellee:** | Jon Michelle Richardson, of Richardson Law Group, P.C., of Chicago, for appellee. |