# Illinois Official Reports

## Appellate Court

---

### *Schultze v. ABN AMRO, Inc.*, 2017 IL App (1st) 162140

---

| | |
|---|---|
| Appellate Court Caption | ROBERT D. SCHULTZE, Plaintiff-Appellee, v. ABN AMRO, INC., and THE ROYAL BANK OF SCOTLAND, N.V., Defendants-Appellants. |
| District & No. | First District, Second Division<br>Docket No. 1-16-2140 |
| Filed | July 18, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 10-L-7045; the Hon. Margaret Ann Brennan, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Proskauer Rose, LLP, of Chicago (Nigel F. Telman, Steven R. Gilford, and Amanda Wiley, of counsel), for appellants.<br><br>Law Offices of Edward T. Joyce & Associates, P.C., of Chicago (Edward T. Joyce and Jacob V. Armstrong, of counsel), for appellee. |
| Panel | JUSTICE MASON delivered the judgment of the court, with opinion.<br>Presiding Justice Hyman and Justice Neville concurred in the judgment and opinion. |

## OPINION

¶ 1    Plaintiff-appellee, Robert D. Schultze, filed a complaint alleging defendants-appellants, ABN AMRO, Inc. (ABN), and The Royal Bank of Scotland, N.V. (RBS) (formerly known as ABN AMRO Bank, N.V.), violated the Illinois Wage Payment and Collection Act (Act) (820 ILCS 115/1 *et seq.* (West 2008)) by failing to pay him the proper amount of his earned bonus and severance pay. After trial, the trial court ruled in favor of Schultze, ordering ABN to pay $2 million as an earned bonus and $375,000 as severance, offset by amounts already paid, plus 5% interest and attorney fees.[1] On appeal, ABN contests the judgment award because it contends (1) the bonus paid to Schultze was discretionary and not pursuant to a contract and (2) Schultze failed to execute a separation agreement and general waiver that was a prerequisite to receiving any severance in accordance with ABN's written policy. Finding no merit in ABN's claims, we affirm.

¶ 2                              BACKGROUND

¶ 3    In 1983, Schultze began working for LaSalle National Bank (LaSalle), formally a subsidiary of ABN. Through his many promotions and advancements at ABN, Schultze was never offered a written employment contract detailing his salary and bonus; instead, his employment agreements were always oral. Even after he became an officer of the bank, Schultze did not receive a written contract detailing his bonus. When ABN later promoted Schultze to vice president, there again was no written contract, but Schultze knew the range of what a bonus would be if he performed satisfactorily.

¶ 4    Although Schultze's salary was fixed, his annual performance bonus was not. But because bonuses were calculated as a multiple of an executive's salary and given the history of his employment at ABN, Schultze knew that if he and his team met their performance goals, he would receive a multiple of his salary as a bonus. An employee's performance was objectively analyzed annually using specific, measurable, achievable, realistic targets (referred to internally at ABN as SMART), which provided the employee with measurable goals to attain during the performance year that would be assessed for achievement at year-end. Each aspect of the SMART analysis was weighted based on varying levels of importance. To determine a bonus amount for senior executives, ABN also considered (1) personal performance, (2) team performance, (3) the larger group (bank) performance, (4) compensation paid to executives in similar roles globally, (5) competitors' bonuses (because ABN was a highly competitive organization), (6) performance of the overall market, and (7) bonuses paid the previous year for the same position. For nearly 25 years, ABN adopted the same process to determine bonuses except for performance year 2008. Historically, the bank's profitability was an important component used to evaluate performance, but starting in performance year 2007 and in anticipation of an upcoming sale of LaSalle to Bank of America, goals were focused on safety, soundness, meeting regulatory hurdles, disintegrating operations and information technology platforms, and managing the rotation of risk.

¶ 5    Computation of a specific employee's bonus began by reviewing a spreadsheet provided by human resources detailing the employee's history of bonus awards, predecessors' bonuses

---

[1]After briefing on attorney fees, the trial court entered judgment against ABN for a total of $2,838,968.22.

for the same position, benchmark bonuses from competitors (third-party sources), and the employee's SMART performance rating. The individual determining bonuses used this spreadsheet along with ABN's profitability and the pool of bonuses allocated to a business unit to determine an employee's bonus, which was then submitted to division leaders for approval.

¶ 6    In 2000, ABN promoted Schultze to executive vice president and chief financial officer (CFO) of ABN Wholesale Client Services Division for North America. Schultze served in that position from late 2000 to approximately the first quarter 2006. During that time, Schultze's base salary increased approximately $100,000 through a series of raises. Typically, Schultze allocated his salary increase to the pool of funds available for raises for his team, finding it unnecessary to take a one or two percent salary increase for himself. But Schultze was compensated, as he always had been, with a bonus and salary.

¶ 7    For approximately six months in 2006, Schultze acted as interim CFO of LaSalle while the bank searched for a permanent CFO. After LaSalle filled the position, Schultze returned to his position as CFO of the Wholesale Client Services Division of ABN. Schultze remained in that position until February 2007 when ABN promoted him to managing director and chief operating officer (COO) of ABN's Global Markets North America Division. When Schultze accepted this position, ABN provided him with a range of what his bonus would be, which was more than his salary as CFO but something less than $1 million because he would no longer be running a trading desk. Schultze's understanding was that his combined salary and bonus would be around $1 million if he performed satisfactorily. Schultze remained in the managing director and COO of ABN's Global Markets North America positions until he was terminated by ABN in April 2009.

¶ 8    In spring 2007, ABN announced that LaSalle would be sold to Bank of America with an anticipated closing date of October 1, 2007. In mid-October 2007, a consortium of banks, which included RBS along with two other banks, won a tender offer and began the process of acquiring ABN. John Nelson, head of ABN Global Markets North America and chief executive officer (CEO) of ABN North America, asked Schultze to manage both the $21 billion sale of LaSalle to Bank of America and the $93 to $94 billion sale of ABN to the consortium. Schultze's title became executive vice president and executive lead of the ABN North America Transition Leadership Team.

¶ 9    For the year ending December 2007, Schultze's base salary was a little over $300,000 and his combined salary and bonus was approximately $1 million to $1.1 million. Also during 2007, Schultze received two retention bonuses, which were intended to keep him at the bank while the bank was undergoing its divesture but not to compensate him for his performance.[2] Schultze received (1) $200,000 relating to the sale of LaSalle to Bank of America and (2) $1 million relating to the sale of ABN to the consortium if Schultze remained at the bank or its successor until December 31, 2008.

¶ 10    The sale of ABN was the largest financial services transaction up to that time. ABN was being dismantled, broken up into pieces, and sold to four different counterparties, all within a predetermined period of time. Nelson offered Schultze the $1 million retention bonus because

---

[2]The retention offer letter expressly stated that the retention bonus "does not replace, supersede or offset any other bonus program in which you may be eligible to participate including any business unit incentive plan or corporate bonus plan." ABN paid the retention bonuses to Schultze and those bonuses are not part of this appeal.

he believed that ABN was exposed to a series of systematic risks and needed someone with a high degree of business acumen who was intelligent, capable, knew the organization well, and could work in a very complex regulatory environment. Nelson considered it essential for Schultze to remain at ABN as long as possible. Schultze became the technical expert and dealt with the purchasing banks, many of the regulatory bodies, and his own people in accomplishing the sale. Nelson described Schultze's job during that time as "a huge job with a massive amount of responsibility and highly complicated." Nelson explained that the purpose of the retention bonuses was to ensure that ABN had the best possible people in the organization through the transition and sale of ABN to the purchasing banks. According to Nelson, all of the transition issues that ABN faced supported Schultze's $1 million retention bonus.

¶ 11    In March 2008, Dennis McHugh, head of ABN Global Markets North America, left ABN and Brad Kopp, an RBS executive "seconded"[3] to ABN as CEO of ABN North America, asked Schultze to assume McHugh's duties, which included transitioning the global markets business from ABN to RBS. Nelson left ABN a few weeks before McHugh left, and Kopp replaced Nelson as CEO of ABN North America. Schultze retained all of his current responsibilities as COO of ABN Global Markets North America and executive lead of the ABN North America Transition Leadership Team but assumed McHugh's responsibilities as well. Schultze's new title was head of ABN Global Markets North America.

¶ 12    Although Kopp was generally aware of ABN's policies, he did not ask Schultze how he was compensated at ABN when he promoted Schultze to McHugh's position. In fact, Schultze never had a conversation with Kopp addressing how executives were compensated at ABN. Likewise, Kopp never informed Schultze to change his expectations regarding the amount of his performance bonus for 2008. Kopp was very complimentary of Schultze's performance and never indicated that his performance was inadequate in any way.

¶ 13    Schultze held the same position (head of Global Markets North America) that both McHugh and Nelson previously held, but Schultze also served as executive lead of the ABN North America Transition Leadership Team—a position that no one else held before. Based on Schultze's understanding of the bonuses paid to Nelson and McHugh for the same position, he expected a bonus in excess of $2 million and in the range of $2 to $5 million for 2008, given the additional position and responsibilities that he had compared to both Nelson and McHugh. In fact, McHugh's bonuses were typically five times or more of his salary. In 2006, McHugh received a $2 million bonus and a $3 million bonus for 2007, both to be paid over three years.

¶ 14    In a letter dated March 9, 2009, Schultze was informed that his 2008 bonus was $200,000, which would be released "subject to and in accordance with the rules of the RBS Group Deferral Plan." Schultze was shocked because the bonus was not commensurate with the type of risk and responsibilities he had undertaken during the preceding year, and he had not received a bonus that low in over a decade.

¶ 15    A few days later, Schultze contacted Kopp to discuss the bonus amount and express his dissatisfaction. Kopp responded to Schultze that he did not know why that was the bonus amount (even though he was the individual who decided Schultze's bonus) but would look into it and get back to him. As a follow-up, Schultze sent Kopp and other executives an e-mail on

---

[3]A seconded employee is on "loan" from one company to another. *Schanfield v. Sojitz Corp. of America*, 663 F. Supp. 2d 305, 337 (S.D.N.Y. 2009).

March 17 setting forth in detail the reasons he believed his bonus had been miscalculated. Schultze received a response from Kopp on April 7 (Kopp's last day at ABN) informing Schultze that "we concluded that your discretionary bonus was in line with your comparators and that the same process was followed for you as for others. We can also confirm that the management team did not take your retention bonus award into account in their decision making." Kopp's letter did not identify (1) anyone else he had consulted with, (2) who comprised the "management team," (3) what "process" was used to set Schultze's bonus, or (4) who were the "comparators" with whom Schultze's bonus was compared.

¶ 16    According to Kopp, he followed ABN's policies regarding bonuses and his method of calculating a bonus was consistent with ABN's typical process. Kopp determined the annual bonuses for his 10 direct reports, who included Schultze, for performance year 2008 and used the same process for all the direct reports. To determine bonuses, Kopp solicited a broad sample of comments about an employee's performance by talking to as many people as possible who worked with the employee and reviewed the performance report completed by the employee. Based on the allocated bonus pool assigned to his business unit (North America), Kopp then allocated bonuses to all the employees in the business unit, including his 10 direct reports. But Kopp indicated that he gave no consideration to what an employee's predecessor with the same title previously earned because this factor would be irrelevant given that performance bonuses were determined based on the employee's performance in that fiscal year.

¶ 17    As part of Kopp's reconsideration of Schultze's bonus, he discussed the bonus amount with individuals at RBS to ensure that the bonus was as fair as possible, and, in particular, he spoke with Helen Finnegan in the human resources department, who was another seconded executive. Everyone Kopp consulted with was comfortable that Schultze's bonus was in line with others at his level. Kopp did not know the amount of Schultze's prior bonuses when he determined the 2008 bonus nor did he ask Schultze how ABN historically determined bonuses. According to Kopp, no ABN executive after he became CEO of ABN North America told him that ABN routinely considered the bonus paid to the person who previously held the executive's position in computing a bonus amount. Kopp believed that Schultze's $200,000 bonus was fair factoring in Schultze's performance for the year and the limited size of the bonus pool available for allocation to the business unit. According to Kopp, Schultze's bonus was in the top 25% of bonuses given to his 10 direct reports. ABN introduced no evidence of the size of the bonus pool at trial. Kopp did not promise Schultze that his bonus would be similar to his predecessors, which Kopp did not believe would have been an appropriate commitment to make because, in his view, bonuses focused on an executive's performance in that fiscal year and how the company and the business unit performed.

¶ 18    Effective April 17, 2009, ABN terminated Schultze and offered him $300,000 as severance representing 52 weeks of his salary. Schultze, however, asserted that his severance should have been $375,000 based on his 25 years of service. To receive severance, ABN required Schultze to sign a separation agreement and general waiver (release).[4] Schultze and ABN exchanged drafts of the release with Schultze executing a modified release on September 24, 2009, which

[4]ABN's "Severance Pay Plan Document" states: "In order to receive the severance available under the Plan, an eligible employee must submit a signed Waiver and Release Agreement form to the Plan Administrator on or within forty five (45) days after his/her date of termination of employment."

expressly waived any and all claims, *except* his claim relating to the 2008 bonus. Because Schultze was not satisfied with his $200,000 bonus, he did not sign the release required by ABN, and ABN did not pay him any severance.

¶ 19     After Schultze's request to reconsider his 2008 bonus and payment for severance proved unsuccessful, he filed a complaint in the trial court requesting payment under the Act and for attorney fees under the Attorneys Fees in Wage Actions Act (705 ILCS 225/1 (West 2008)). Schultze sought final compensation totaling at least $2.375 million, consisting of at least $2 million in earned but unpaid bonus compensation, and $375,000 in earned but unpaid severance compensation. Following a bench trial, the trial court entered judgment in favor of Schultze in the amount of $2.375 million, less the $200,000 bonus already paid by ABN, plus 5% prejudgment interest, finding that ABN's condition that Schultze sign a release before paying his severance resulted in an unjustified delay. The trial court also awarded attorney fees and costs. ABN timely appealed the trial court's judgment award.

¶ 20                                                      ANALYSIS

¶ 21     ABN first claims that the trial court erred in awarding Schultze a $2 million bonus because a discretionary bonus is not recoverable under the Act. ABN contends that there was no unequivocal promise to pay a bonus pursuant to an employment contract or agreement and the trial court instead erroneously awarded a bonus based on Schultze's expectations and ABN's past practices.

¶ 22     The Act allows employees to sue for the timely and complete payment of earned wages or final compensation. *Andrews v. Kowa Printing Corp.*, 351 Ill. App. 3d 668, 675 (2004). The Act defines "final compensation" as "wages, salaries, earned commissions, earned bonuses, and the monetary equivalent of earned vacation and earned holidays, and any other compensation owed the employee by the employer pursuant to an employment contract or agreement between the 2 parties." 820 ILCS 115/2 (West 2008). To establish a violation of the Act, a plaintiff must allege that "(1) the defendant was an 'employer' as defined in the Wage Payment Act; (2) the parties entered into an 'employment contract or agreement'; and (3) the plaintiff was due 'final compensation.' " *Catania v. Local 4250/5050*, 359 Ill. App. 3d 718, 724 (2005). Because we must determine whether the Act applies to Schultze's claim of an earned but unpaid bonus, we review that question of law *de novo*. *Andrews*, 351 Ill. App. 3d at 672.

¶ 23     ABN claims that Schultze's bonus was discretionary and not pursuant to any "employment contract or agreement," thus defeating application of the Act. But contrary to ABN's position, a formal contract is not required to recover under the Act. *Landers-Scelfo v. Corporate Office Systems, Inc.*, 356 Ill. App. 3d 1060, 1067 (2005). This court has recognized that a plaintiff must prove the existence of a valid and enforceable contract to recover under a *breach of contract* claim, but no such requirement exists to recover under the Act. *Id.* at 1068; *Catania*, 359 Ill. App. 3d at 724. Significantly, the legislature purposely included the term "agreement" in the definition of "final compensation" (820 ILCS 115/2 (West 2008)), and an "agreement" is more expansive than a contract because an "agreement" merely requires a manifestation of mutual assent by the parties without requiring the formalities and accompanying legal protections of a contract. 56 Ill. Adm. Code 300.450 (2014); *Landers-Scelfo*, 356 Ill. App. 3d at 1067-68 (citing *Zabinsky v. Gelber Group, Inc.*, 347 Ill. App. 3d 243, 249 (2004), Black's Law Dictionary 35 (abr. 5th ed. 1983), and Restatement (Second) of Contracts § 3 cmt. a, at 13

(1981)). In essence, in order to recover under the Act, a plaintiff is only required to demonstrate facts displaying mutual assent to terms. *Landers-Scelfo*, 356 Ill. App. 3d at 1068. Importantly, employers and employees may manifest mutual assent by conduct alone, including past practice. *Id.*; 56 Ill. Adm. Code 300.450 (2014).

¶ 24    There was ample evidence presented at trial demonstrating a long history of ABN's manifestation of mutual assent and "unequivocal promise" to award Schultze a bonus according to ABN's standards in exchange for his quality performance. Apart from the first two years of Schultze's nearly 25-year career with ABN when he was not an executive, Schultze always received a salary and bonus. Indeed, there is no evidence indicating that Schultze's compensation, as an executive of the bank, did not consist of both a salary and bonus component. Notably, even Kopp recognized that ABN, and every firm, paid compensation based on the combination of a salary and bonus. Moreover, ABN sent Schultze a letter notifying him that he was entitled to a bonus for performance year 2008 but nevertheless contends that there was no "unequivocal promise" to pay a bonus. ABN's express statement that Schultze was entitled to a bonus in 2008 cannot be reasonably interpreted to mean anything other than an unequivocal promise to pay a bonus. Moreover, ABN's past conduct of awarding Schultze an annual bonus for more than two decades manifested an agreement to award a bonus as a component of Schultze's total compensation. Consequently, there was an "agreement" and "unequivocal promise" that Schultze's compensation included a bonus and payment of that bonus as part of Schultze's compensation was not discretionary.

¶ 25    Likewise, the record reveals that Schultze's 2008 earned bonus totaled at least $2 million, and not the $200,000 awarded to him. There is no dispute that 2007 and 2008 were transition years as ABN was being dismantled and sold as part of what was then the largest financial services transaction in history. During this critical time, Schultze took on additional responsibilities and became the executive head of the bank's transition leadership team—a position described as entailing massive amounts of responsibility and highly complicated tasks given the bank's complex and heavily regulated environment.

¶ 26    Kopp later promoted Schultze to McHugh's prior role as head of Global Markets North America, and Schultze retained his existing responsibilities as COO of Global Markets North America and transition head. Importantly, at the time Schultze took on this additional role, Kopp did not inform Schultze that there would be any change in ABN's long-standing policy regarding the calculation of bonuses.

¶ 27    The evidence presented at trial overwhelmingly demonstrated that in setting Schultze's 2008 performance bonus, Kopp deviated from the long-standing methodology ABN had used to calculate executive bonuses. Nothing in the record indicates that Kopp completed the SMART analytical framework as Schultze's supervisors had in the past, and Kopp did not cause to be prepared spreadsheets containing the detailed information ABN typically compiled before setting an executive's bonus.

¶ 28    In particular, the record demonstrates that ABN had consistently calculated bonuses taking into consideration the bonus paid to an executive's predecessor. But Kopp believed that a predecessor's bonus was irrelevant because a bonus depended upon the individual's performance in a particular fiscal year and how the bank and business unit performed. Kopp's methodology is particularly troubling because he gave no consideration to the bonuses paid to Schultze's predecessors (McHugh and Nelson) and did not know the amount of Schultze's prior bonuses—information that had historically been included in the spreadsheet analysis. We

cannot ignore the fact that Schultze's predecessors received bonuses in excess of $2 million for Schultze's same position, but Kopp determined that a $200,000 bonus to Schultze for assuming the same responsibilities as his predecessors, in addition to the substantial responsibilities associated with the sale transactions, was proper.

¶ 29    Comparatively speaking, the bonus paid to Schultze's immediate predecessor—McHugh—for 2006 was $2 million and for 2007 was $3 million (as head of Global Markets North America). Accordingly, ABN's bonus award of $200,000 was a fraction of the bonuses it previously paid for Schultze's same role. Indeed, even Nelson (Kopp's predecessor) believed that the $200,000 bonus fell below what he considered reasonable given (1) the complex environment at ABN during that time and (2) the additional responsibilities given to Schultze. Importantly, ABN paid McHugh a $3 million bonus in 2007—also described as a "transition year" for ABN. Particularly noteworthy is the fact that the bonus letter dated March 8, 2009, addressed to Schultze stated that the bonus would be paid according to *RBS's* deferred compensation policy—rather than ABN's policy.

¶ 30    Not only did Kopp change the long-standing methodology used to calculate bonuses by ignoring the bonuses paid to Schultze's predecessors and otherwise failing to follow ABN's bonus policy, but he also did not communicate the change to Schultze before Schultze fully performed his employment responsibilities to earn his bonus for 2008. Under the Act, "[a]n employee has a right to an *earned bonus* when there is an unequivocal promise by the employer and the employee has performed the requirements set forth in the bonus agreement between the parties and all of the required conditions for receiving the bonus set forth in the bonus agreement have been met." (Emphasis added.) 56 Ill. Adm. Code 300.500(a) (2014). When ABN awarded Schultze a $200,000 bonus, Schultze had already fully performed the requirements to earn the bonus that was unequivocally promised to him as part of his compensation. Moreover, nothing in the record demonstrates that Schultze's performance was inadequate or not deserving of a bonus. In fact, ABN acknowledges that Schultze "was highly regarded in 2008 and prior years." Consequently, ABN's change to the long-standing methodology used to calculate Schultze's bonus after he had already earned it directly violated the Act. ABN cannot, following Schultze's full performance, alter his compensation by awarding him a drastically reduced bonus. *Cf. McLaughlin v. Sternberg Lanterns, Inc.*, 395 Ill. App. 3d 536, 544 (2009) (*pro rata* bonus denied where employee did not perform employment responsibilities for the full bonus period).

¶ 31    ABN also argues that because 2008 was such a disastrous year for the financial industry as a whole—with banks, including ABN, sustaining losses across the board—Schultze could not reasonably have expected a 2008 performance bonus in line with past bonuses. But this argument overlooks the undisputed fact that during performance year 2008, the profitability of the business sectors managed by Schultze was not a performance goal. Instead, given the impending sale of (1) LaSalle to Bank of America and (2) ABN to the consortium, Schultze's primary responsibility was to preserve assets and reduce risk while overseeing the disentanglement of ABN's and La Salle's operations. According to the evidence, Schultze succeeded in those goals. Therefore, the lack of profitability was anticipated and, indeed, inherent in the responsibilities ABN asked Schultze to assume, and thus, ABN cannot rely on this factor as justification for Schultze's greatly diminished bonus award.

¶ 32    In sum, because Schultze fully performed the services required to earn his bonus and ABN improperly and after the fact changed the methodology used to compute that earned bonus,

depriving Schultze of his compensation, the trial court did not err in awarding Schultze $2 million, representing the minimum bonus commensurate with his increased responsibilities and undisputed satisfactory performance. Based on the record, an allowable bonus amount ranged from $2 to $5 million. We therefore find no merit in ABN's argument that the trial court substituted its judgment for ABN's given that the awarded $2 million bonus was not only within the allowable range but was, in fact, the minimum bonus supported by the evidence.

¶ 33    Likewise, we are not persuaded by ABN's argument that a ruling in favor of Schultze would open the floodgates to claims under the Act by employees dissatisfied with a bonus award. Schultze's circumstances were unique, and the multiple positions ABN asked him to fill are not likely to recur. That said, Schultze established a clear violation of the Act due to ABN's demonstrated failure to follow the process it assured Schultze would be used to determine his bonus.

¶ 34    ABN next claims that Schultze was not entitled to severance of $375,000 because he failed to execute a release waiving all claims, which ABN asserts was a proper prerequisite to receiving severance benefits. Absent Schultze's execution of the release, ABN claims there was no valid contract for severance.

¶ 35    A release is a contract that provides for the abandonment of a claim against another. *Borsellino v. Putnam*, 2011 IL App (1st) 102242, ¶ 103. A release may be included in a separation agreement, and requiring execution of a release in exchange for severance has been upheld by this court. *Hurd v. Wildman, Harrold, Allen & Dixon*, 303 Ill. App. 3d 84, 92-93 (1999); *Golden v. McDermott, Will & Emery*, 299 Ill. App. 3d 982, 993 (1998). But settlement of claims in the form of a release signed by an employee relating to an employer's violation of the Act is not permissible. 820 ILCS 115/9 (West 2008). We review *de novo* the legal issue of whether ABN's release improperly required Schultze to waive a claim brought under the Act. *Andrews*, 351 Ill. App. 3d at 672.

¶ 36    As stated above, Schultze communicated his dissatisfaction with the $200,000 bonus when he learned of the bonus amount and before ABN terminated his employment on April 17, 2009. Schultze refused to sign the release unless it was modified to exclude the release of his 2008 bonus claim. Accordingly, Schultze sent ABN a modified version of the release that he executed specifying that he agreed to a release of all causes of action, claims, damages, judgments or agreement of any kind, *except* claims relating to his earned bonus.

¶ 37    In essence, by requiring Schultze to release all claims, including those relating to his 2008 bonus, as a prerequisite to receiving severance that he was otherwise entitled to,[5] ABN was seeking to preclude Schultze from pursuing his claim under the Act. Even though Schultze had not yet filed a complaint asserting a violation of the Act, ABN was aware of his earned bonus claim and improperly conditioned payment of severance on his release of that claim for no consideration other than severance benefits to which Schultze was already entitled. Moreover, Schultze executed a release modified to retain his rights to pursue payment of his earned bonus but waiving all other claims. Because ABN improperly conditioned payment of severance on Schultze's release of his 2008 bonus claim based on a violation of the Act and Schultze otherwise complied with all other conditions to receiving his severance pay, the trial court did not err in awarding $375,000 as severance.

_____

[5]ABN does not argue that Schultze would not be entitled to severance benefits had he signed a release of all claims.

¶ 38  We affirm the trial court's judgment in favor of Schultze awarding a $2 million bonus, offset by the $200,000 payment already made, and severance of $375,000. We also affirm the award of prejudgment interest and attorney fees as ABN has not challenged on appeal those aspects of the trial court's judgment.

¶ 39  Affirmed.