**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2024 IL App (3d) 230289-U

Order filed June 18, 2024

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2024

| | | |
|---|---|---|
| VISION ENERGY, LLC, | ) | Appeal from the Circuit Court |
| | ) | of the 21st Judicial Circuit, |
| Plaintiff and Counterdefendant-Appellee, | ) | Kankakee County, Illinois, |
| | ) | |
| v. | ) | |
| | ) | |
| JANE E. SMITH, | ) | Appeal No. 3-23-0289 |
| | ) | Circuit No. 21-MR-116 |
| Defendant, Counterplaintiff, and Third-Party Plaintiff-Appellant | ) | |
| | ) | |
| (J. Turner Hunt, Third-Party Defendant-Appellant; OEG/Vision/Friends, LLC, and Orion Energy Group, LLC, Third-Party Defendants). | ) | Honorable Lindsay A. Parkhurst Judge, Presiding. |

_____

JUSTICE DAVENPORT delivered the judgment of the court.
Justices Holdridge and Hettel concurred in the judgment.

_____

**ORDER**

¶ 1        *Held*:  We affirm the circuit court's grant of summary judgment in favor of defendants on plaintiff's claim under the Illinois Wage Payment Collection Act.

¶ 2        In 2021, plaintiff Vision Energy, LLC (Vision) sued its former employee, defendant Jane

E. Smith, seeking a declaration that the Illinois Wage Payment Collection Act (Act) (820 ILCS

115/1 *et seq.* (West 2020)) did not apply to a dispute over certain monies Smith was entitled to receive under a July 2012 memorandum of understanding (MOU). In response, Smith brought counterclaims against Vision and third-party claims against J. Turner Hunt, OEG/Vision/Friends, LLC (OVF), and Orion Energy Group, LLC (Orion).[1] Smith in part asserted that Vision and Hunt violated the Act when Vision failed to pay her certain monies per the MOU (wage claim). The circuit court later entered summary judgment on Smith's wage claim in Vision and Hunt's favor.

¶ 3        Smith appeals, and we affirm.

¶ 4                                I. BACKGROUND

¶ 5                              A. The K4 Wind Farm

¶ 6        Hunt is the sole owner of Vision, which has its principal place of business in Ohio. In 2007, Vision began developing the K4 Wind Farm in Ford, Iroquois, Kankakee, and Livingston Counties, by obtaining leases and easements from private landowners to site wind turbines. Vision enlisted Brent Creek, Marci Burton, and Jeff Harris to assist with the development. In August 2008, Hunt formed Friends of K4, LLC (Friends), which had a 10% ownership interest in the K4 wind farm. Friends had four members: Vision, Creek, Burton, and Harris. (Vision was the managing member but had no equity.) Over time, Vision compiled the leases and easements necessary for the construction of a 50,000-acre wind farm.

¶ 7                        B. Vision Hires Smith to Manage Its Office

¶ 8        Vision leased an office in Herscher to act as its base of operations for this project. In July 2008, Vision hired Smith to manage the office on a part-time basis at the rate of $17 per hour. Smith's duties included keeping records and interacting with landowners and others who came

---

[1]OVF and Orion are no longer parties to this action.

into the office. According to Smith, Harris was Vision's "main representative who worked out of the office." In late 2010, however, Harris left Vision, and many additional duties fell on Smith.

¶ 9                                        C. The July 2012 MOU

¶ 10        In 2012, Smith asked Vision to increase her pay. In her deposition, Smith explained that for her to remain an employee, she "felt [she] needed to receive compensation as in the form of royalty payments after the wind farm was built." Smith told Hunt she "was his anchor in Illinois" and would commit to the project until completion if she "would receive royalty payments after the wind farm was built for the duration of the wind farm." After some negotiations, in July 2012, Smith and Vision executed the MOU, which was the product of exchanged drafts.

¶ 11        The MOU contained several recital paragraphs, which indicated the following. Creek, Burton, and Harris had agreed to take reduced compensation in exchange for their interests in Friends. Smith was the sole on-site employee of Vision in Illinois. She worked a regular weekly schedule, was paid an hourly wage, and was "a valued development specialist working on the [wind farm] since July 1, 2008." However, Smith was not offered admission into Friends at the time of its organization because she was "not known" at that time. In addition, Friends was unable to admit Smith to Friends because that would have "require[d] undue legal complications on Friends and Friends['s] relationship with the other entities that are also owners of [the wind farm]." Nevertheless, Smith "ha[d] committed to [the] project until the [wind farm] was constructed." Thus, even though Smith did not agree to a reduced wage, Vision wished to provide "compensation" to Smith that was "similar to what Creek or Burton may receive as a result of [their] membership interest in Friends." All parties involved in the wind farm understood that Smith was to be considered part of a "Special Project Vehicle." Further, "all parties involved in

3

the [wind farm] underst[ood] as each portion of the project [was] built[,] *** Smith [was] included in the Special Project Vehicle."

¶ 12    Ultimately, Vision and Smith agreed to "a fixed wage of $1.00 per hour increase per year starting [on] July 1, 2012." In addition, Vision granted Smith royalties.[2] Specifically, the MOU stated Smith was granted, "immediately and irrevocably, *** compensation equal to 2% of any and all portions of the [wind farm] up to 150 [megawatts] and 3% of any and all portions of the [wind farm] over 150 [megawatts]," which was to be "of [the] same like kind and at the same time as received by [the] member[s] of Friends." The MOU further provided that Smith could bequeath her royalty rights to her spouse or her son. In addition, Vision agreed that any negotiations to sell the wind farm would "include honoring [the MOU]."

¶ 13    After July 2012, Smith continued in her role as office manager. By 2014, her duties included maintaining records, meeting with landowners and their associates, and facilitating amendments to and extensions of their lease agreements. In addition, she coordinated the signing of "estoppels and [subordination, nondisturbance, and attornment agreements] and many documents" and acted as the project's notary. At that time, Vision paid Smith $26 per hour.

¶ 14                          D. The K4 Wind Farm is Sold

¶ 15    In 2014, Électricité de France (EDF), a French government-owned electric utility company, purchased the right to construct the K4 Wind Farm. In exchange, EDF agreed to pay lump sums upon certain development milestones and ongoing royalties derived from the sale of electricity generated by the wind farm. EDF constructed the wind farm in two phases: Pilot Hill, which

---

[2]Smith has referred to these payments as royalties throughout this litigation. However, in her reply brief, she takes issue with Vision and Hunt's characterization of those payments as royalties. We will refer to the payments as royalties.

became operational in 2015 and can generate 175 megawatts, and Kelly Creek, which became operational in 2016 and can generate 184 megawatts.

¶ 16                                E. EDF Hires Smith

¶ 17        After EDF purchased the wind farm, in August 2014, Smith's employment with Vision ended. Smith admitted this fact in her original answers to interrogatories and in a deposition she gave in a case brought by Harris against Vision. She now disputes that her employment with Vision ended. According to Smith, Vision did not owe her any wages or royalty payments when she left Vision.

¶ 18        Smith applied for a position with EDF, using Hunt as a reference. She spoke to John Baker, an EDF project developer, about the job and interviewed with Ian Krygowski. EDF hired Smith as a landowner liaison, initially on a temporary basis via Ranstad (a staffing agency) and later as a W-2 employee. Smith signed employment-related documents required by EDF and was given an EDF email address. EDF paid Smith $26 per hour, and Smith received employment benefits from EDF. Kryogwski was Smith's supervisor. Her duties included maintaining files, greeting landowners and their associates, planning events, and maintaining records of payments to landowners. EDF issued Smith's paychecks, withheld taxes, and provided her a W-2 statement each year she was employed.

¶ 19        In a deposition, Smith agreed she took no instruction from Vision or Hunt after she became EDF's employee. However, she testified "[t]he work [she] did for EDF also benefited all of the companies involved in the wind farm development." Smith continued her employment with EDF until she retired on February 2, 2017.

¶ 20                            F. Smith Begins Receiving Royalties

5

¶ 21    In September 2014, Smith received her first royalty payment under the MOU, which was derived from a development milestone payment made by EDF. Two more milestone royalties followed in June 2015 and April 2016. Smith received her first royalty derived from energy-production in April 2016. She received energy-production royalties again in July 2016, December 2016, March 2017 (two payments), and May 2017. At no time did Hunt tell Smith how her royalty payments were calculated.

¶ 22                              G. Smith Stops Receiving Royalties

¶ 23    In 2017, however, Smith began to question Hunt about the payments she received, believing she was being shorted. In January 2017, Hunt offered Smith membership in Friends in exchange for giving up her rights under the MOU. He sent a proposed amended Friends operating agreement, which would admit her as a 20% member. Hunt and Smith discussed how to equalize her MOU rights with her proposed percentage share of Friends. Ultimately, in a May 2017 e-mail, Hunt told Smith that if she did not agree to exchange her MOU rights for a share of Friends, he would "take further actions that w[ould] not be favorable to [her]." Smith, however, refused to do so. From that point forward, Smith received no further royalties.

¶ 24                              H. Procedural History

¶ 25                              1. *Vision's Declaratory Judgment Action*

¶ 26    In March 2021, Vision filed a declaratory judgment complaint against Smith. Essentially, Vision alleged that Smith's employment ended on August 31, 2014, and that it had paid her all wages and final compensation due at that time. Vision asked the court to declare that the royalties were neither "wages" nor "final compensation" as defined by the Act. Vision asked the court to instead declare that the royalties were "equity" payments in recognition of Smith's services, not direct compensation for her employment.

¶ 27        2. *Smith's Answer, Counterclaims, and Third-Party Complaint*

¶ 28        Smith answered Vision's complaint and asserted counterclaims, as well as third-party actions against Hunt, OVF, and Orion. OVF and Orion moved for dismissal, and Smith amended her claims to remove them as third-party defendants. In her first amended counterclaim and third-party complaint, Smith asserted a breach of contract claim, alleging Vision and Hunt breached the MOU by underpaying her royalties until 2017 and failing to pay any royalties thereafter. Smith asserted the Act applied to the breach of contract claim and, thus, sought statutory damages and reasonable attorney fees and costs. (In this pleading, Smith did not separate her breach of contract claim and wage claim into separate counts.) Smith also brought claims of conversion, "conspiracy," and for declaratory relief.

¶ 29        3. *Smith's Motion for Summary Judgment*

¶ 30        Smith moved for summary judgment on her breach of contract claim. In November 2022, the circuit court granted Smith's motion in part, finding Vision had breached the MOU but reserving the issue of damages. The court denied Smith's motion insofar as it sought a finding that the parties' dispute was subject to the Act. As part of its order, the court gave Smith leave to amend her pleading and set a bench trial on damages on March 23, 2023.

¶ 31        4. *Smith's Second Amended Counterclaim and Third-Party Complaint*

¶ 32        In December 2022, Smith filed her second amended counterclaim and third-party complaint, which is her currently operative pleading. This pleading was substantially similar to Smith's first amendment, except that she separated her breach of contract claim and wage claim into separate counts.

¶ 33        5. *Vision Energy and Hunt's Motion for Summary Judgment*

7

¶ 34       On March 1, 2023, Vision and Hunt moved for summary judgment on Smith's wage claim. They asserted Smith had conceded, in discovery, that her employment with Vision ended in August 2014, she received all of the compensation due to her while she was employed, and no royalty payments were due to her until after her employment with Vision ended. They maintained Smith's was a claim for final compensation. And under section 5 of the Act (820 ILCS 115/5 (West 2020)), the royalties at issue in the lawsuit were not subject to the Act because they could not have been paid on the date her employment ended or by her next regularly scheduled payday—the energy-production royalties did not exist until 2015, when Pilot Hill became operational. Further, Vision and Hunt asserted that Smith's only recourse was her breach of contract claim, which remained pending and was awaiting a trial on damages.

¶ 35       Vision and Hunt also filed two depositions given by Smith: the one given in Harris's action against Vision and the other given in this matter.

¶ 36       In her response, Smith asserted she worked for both Vision and EDF after EDF purchased the K4 Wind Farm. She argued that she continued to work on the project after it was sold per the commitment she made in the MOU, thus "qualif[ying] her as a continuing employee under the [Act]." Further, she contended the royalties were "any other compensation" within section 2's definition of "final compensation." See *id.* § 2. According to Smith, this was true even though that compensation could not be calculated at the time of separation, because the MOU granted those compensation rights "immediately and irrevocably." She maintained that section 5 did not limit the otherwise broad definition of final compensation, as urged by Vision and Hunt.

¶ 37       In an affidavit attached to her response, Smith averred the following in regard to her theory that Vision remained her employer after EDF purchased the project:

8

"I worked out of the Herscher office for Vision Energy and for EDF, essentially doing the same job for both. By remaining on the project, I kept my commitment to Turner Hunt (Vision Energy) to stay with the project until the wind farm's commercial operation date. I was working on the project for both EDF and Vision Energy in early September 2014."

Additionally, she averred,

"I did not resign from Vision Energy ***. I remained in the job, after EDF took over management of the wind farm. I was working for both Vision Energy (as I had committed to Vision in the [MOU]) and EDF until the wind farm was built and started commercial operation in around February 2017."

¶ 38    In reply, Vision and Hunt asserted Smith's new affidavit was directly contradicted by her deposition testimony, where she stated her "last date of employment with Vision Energy" was "in August, middle of August 2014."[3] They argued Smith's deposition testimony was a binding judicial admission that could not be contradicted by her affidavit. Further, they argued, the "entire statutory scheme" of the Act required that final compensation—other than that comprised of *earned* bonuses, *earned* commissions, and the monetary equivalent of *earned* vacation and holidays—"must be identified and calculated only at the time of separation from employment." Vision and Hunt also argued the MOU was not an employment contract or agreement under section 2 of the Act, because Smith's commitment, under the MOU, was to "the project" and not necessarily to remain an employee of Vision.

¶ 39                                6. *The Circuit Court's Decision*

---

[3]Vision also contended Smith had recently amended her answers to interrogatories to be consistent with her allegation that she worked for Vision even after EDF purchased the K4 Wind Farm. The record does not contain Smith's amended answers to interrogatories.

9

¶ 40    The court granted Vision and Hunt's motion. It found Smith was employed by Vision and Hunt from July 1, 2008, through August 15, 2014. She became EDF's employee on August 18, 2014, and continued as EDF's employee until February 4, 2017. In July 2012, the parties, who were then in an employment relationship, executed the MOU under which Smith was awarded "future compensation based on a percentage of profits," which was a *de facto* royalty. That royalty "vested immediately and irrevocably for future profits if any." Those profits commenced in July 2015 for Pilot Hill and in November 2016 for Kelly Creek. Finally, it found, based on Smith's admission in her deposition, that "no payroll monies *** and no royalties were due at the time of [Smith's] separation from employment with Vision/Hunt in August 2014."

¶ 41    Given its finding that Smith was separated from Vision in 2014, the court characterized Smith's claim as one for final compensation and identified two questions it believed controlled the case: (1) "whether the royalties were 'earned' at the time of separation" and (2) "whether the royalties [were] considered other compensation 'due' at the time of separation." The court answered the first question in the negative, relying on a 2007 Internal Revenue Service (IRS) publication. The court explained that, per that publication, royalties are only earned if derived from a self-employment business enterprise. Here, however, Smith was an employee subject to the Federal Insurance Contributions Act and was not engaged in the occupation or profession of developing, building, implementing, and running wind farms. Accordingly, any royalties she received or would receive were not earned royalties and were therefore not earned income at the time of separation.

¶ 42    The court also answered the second question in the negative. It found the "central issue" was whether the royalties were "due" at the time of separation. The court found, per the MOU, Smith's right to the royalties vested immediately and irrevocably. The court nevertheless found

10

the royalties were not due at the time of separation for two reasons: (1) Smith admitted no monies were due to her at the time of separation, and (2) the profits from which the royalties were derived did not materialize until after her separation.

¶ 43    The court made a finding under Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016), and this appeal followed.

¶ 44                                    II. ANALYSIS

¶ 45                                A. Standard of Review

¶ 46    "The purpose of summary judgment is not to try a question of fact but to determine the existence of any genuine issue of fact." *Foley v. Builtech Construction, Inc.*, 2019 IL App (1st) 180941, ¶ 50. Summary judgment is appropriate only when "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2020). The nonmoving party need not prove his or her case to survive summary judgment, but the party "must present some factual basis that arguably entitles the party to a judgment." *Foley*, 2019 IL App (1st) 180941, ¶ 51. "The court may draw inferences from undisputed facts; however, if reasonable persons could draw divergent inferences from those facts, the motion for summary judgment should be denied, and the trier of fact should decide the issue." *Id.*

¶ 47    We review *de novo* the grant of summary judgment. *Pielet v. Pielet*, 2012 IL 112064, ¶ 30. This case requires us to construe the Act, a task likewise subject to *de novo* review. *In re County Treasurer and ex officio County Collector*, 2023 IL App (3d) 220226, ¶ 42. Thus, we are not bound to review the circuit court's reasoning; we may affirm on any basis supported by the record. *In re Estate of Reeder*, 2023 IL App (3d) 210361, ¶ 15.

11

¶ 48    B. The Circuit Court Properly Granted Summary Judgment to Vision and Hunt

¶ 49    Vision and Hunt argue the circuit court properly entered summary judgment because Smith's claim for final compensation requires the compensation to be due and owing at the time the employee is separated from employment. And because, by her own admission, Smith was separated from her employment with Vision in August 2014 and no royalties were due at that time, the royalties claimed were not subject to the Act. We agree.

¶ 50    As noted, this case requires us to construe the Act. When construing a statute, our aim is to ascertain and give effect to the legislature's intent. *In re County Treasurer*, 2023 IL App (3d) 220226, ¶ 42. We are guided by the statute's text, which best indicates that intent. *Id.* Accordingly, we apply the statute as written, giving the words used their plain and ordinary meaning. *Id.* We must construe statutes in context of other relevant provisions and avoid a construction that renders meaningless any word or phrase in the statute. *Hacker v. Halley*, 2021 IL App (2d) 210050, ¶ 21. And we may neither add to nor depart from the statute's language by reading into the statute unexpressed exceptions, limitations, or conditions. *In re County Treasurer*, 2023 IL App (3d) 220226, ¶ 42.

¶ 51    The Act's purpose is to ensure employees receive timely and complete payment of their earned wages while employed and their final compensation upon separation from employment, without retaliation from employers. *Miller v. Kiefer Specialty Flooring, Inc.*, 317 Ill. App. 3d 370, 374 (2000). Thus, section 14(a) of the Act permits employees who are not timely paid wages or final compensation to bring a civil action against their employer. 820 ILCS 115/14(a) (West 2020). An employer's officers or agents who knowingly permit a violation of the Act may be held personally liable. *Id.* § 13. In such actions, employees may recover "the amount of any such underpayments and damages of 5% of the amount of any such underpayment for each month

12

following the date of payment during which such underpayments remain unpaid." 820 ILCS 115/14(a) (West 2020). Additionally, they may recover their costs and reasonable attorney fees. *Id.* "To establish a claim under the Act, a plaintiff must demonstrate that 'wages or final compensation is due to him or her as an employee from an employer under an employment contract or agreement.' " *Majmudar v. House of Spices* (*India*)*, Inc.*, 2013 IL App (1st) 130292, ¶ 11 (quoting *Landers-Scelfo v. Corporate Office Systems, Inc.*, 356 Ill. App. 3d 1060, 1067 (2005)).

¶ 52        The Act protects both current employees and those who have separated from their employer. See 820 ILCS 115/2 (West 2020). Whether an employee has a claim for "wages" or "final compensation" under the Act depends on whether the employee has separated from his or her employer. See *id.* (payments to employees, other than separated employees, are termed wages; payments to separated employees are termed final compensation). Thus, we begin with the trial court's finding that Smith was a separated employee of Vision as of August 18, 2014.

¶ 53        The Act does not define the term separated employee. However, we believe the term applies when the employer-employee relationship ceases to exist. See Merriam-Webster's Collegiate Dictionary 1134 (11th ed. 2019) (defining separate as "to become divided or detached" or "to sever an association").

¶ 54        Here, the circuit court found Smith was an employee of Vision from July 1, 2008, through August 15, 2014, and was an employee of EDF from August 18, 2014, through February 2, 2017, essentially finding Smith was a "separated employee" of Vision as of August 15, 2014. In her original answers to interrogatories, Smith unequivocally stated that she "worked for Vision Energy from June 2008 until August 2014" and was an EDF employee, reporting to Ian Krygowski, from "[a]pproximately August 18, 2014[,] through February 4, 2017," at which time she retired. In

13

addition, Smith testified in her deposition in Harris's case against Vision that she left Vision's employ in August 2014 and began working for EDF at that time.

¶ 55 Smith nevertheless argues she remained Vision's employee after it sold the wind farm to EDF, under a joint-employment theory. Our supreme court has recognized that an employee may be jointly employed by more than one employer for purposes of a claim under the Act. *Andrews v. Kowa Printing Corp.*, 217 Ill. 2d 101, 116 (2005). When determining whether an entity is an employee's joint employer, the test to be applied "is whether two or more employers exert significant control over the same employees—where from the evidence it can be shown that they share or co-determine those matters governing essential terms and conditions of employment." (Internal quotation marks omitted.) *Id.* at 117. "Relevant factors to consider include the putative joint employer's role in hiring and firing; promotions and demotions; setting wages, work hours, and other terms and conditions of employment; discipline; and actual day-to-day supervision and direction of employees on the job." (Internal quotation marks omitted.) *Id.*

¶ 56 Applying this standard, we conclude there remains no genuine question of fact on the issue of whether Vision remained Smith's "employer" for purposes of the Act after she began working for EDF in August 2014. Smith relies on her counteraffidavit, which states that, after the sale to EDF, Smith (1) did not resign from Vision; (2) worked for both Vision and EDF, essentially doing the same job for both; and (3) kept her commitment (per the MOU) to stay with the project until the wind farm was commercially operable. Smith's counteraffidavit is contradicted by her sworn testimony (in the Harris case) and answers to interrogatories, where she unequivocally acknowledged her employment with Vision ended in August 2014 and at that time she began working for EDF until her retirement in January 2017. These admissions were binding upon Smith.

14

See *In re Estate of Rennick*, 181 Ill. 2d 395, 406-07 (1998). Smith could not later contradict her admissions in her counteraffidavit, amended discovery answers, or in later testimony. *Id.* at 406.

¶ 57 Further, even if we were to ignore Smith's admissions, she has pointed to nothing in the record that indicates Vision remained her employer under the standard set forth in *Andrews*. See *Foley*, 2019 IL App (1st) 180941, ¶ 51 (the party opposing summary judgment must present some evidence that would at least arguably entitle her to judgment). Indeed, the record contains no evidence from which a trier of fact could conclude that Vision continued to exert significant control over Smith or shared or codetermined matters governing the essential terms and conditions of her employment. *Andrews*, 217 Ill. 2d at 117. Smith has come forward with no evidence that Vision played any role in EDF hiring her (other than Hunt acting as a reference); could have promoted, demoted, or disciplined her; set her wages, work hours, or other terms and conditions of her employment; or actually supervised or directed her work on a day-to-day basis. See *id.*

¶ 58 To the contrary, the record shows that, after Vision sold the wind farm to EDF, EDF and only EDF "act[ed] *** in the interest of an employer in relation to" Smith. 820 ILCS 115/2 (West 2020). Admittedly, there is no dispute Smith's day-to-day duties did not change much after she began working for EDF. And arguably, her work for EDF also benefited Vision, who stood to recoup its investment upon construction of the farm and the generation of electricity. However, by her own admission, Smith applied to EDF, interviewed with EDF, and was hired by EDF. Smith signed employment-related documents required by EDF and was given an EDF email address. EDF paid Smith her hourly wage, issued her paychecks, provided her employment benefits, withheld her taxes, and provided her a W-2 statement at years' end. Kryogwski, an EDF employee, supervised Smith's work. And, according to Smith's own testimony, Vision and Hunt did not

exercise any control over how she performed her work for EDF. Accordingly, we reject Smith's assertion that Vision remained her employer after she began working for EDF on August 18, 2014.

¶ 59 Because Smith was a separated employee as of August 18, 2014, her claim is one for final compensation. We thus turn to section 2 of the Act, which defines "final compensation" as follows:

"Payments to separated employees shall be termed 'final compensation' and shall be defined as wages, salaries, earned commissions, earned bonuses, and the monetary equivalent of earned vacation and earned holidays, and any other compensation owed the employee by the employer pursuant to an employment contract or agreement between the 2 parties." 820 ILCS 115/2 (West 2020).

Section 5 of the Act governs when final compensation must be paid to a separated employee. Specifically, "Every employer shall pay the final compensation of separated employees in full, at the time of separation, if possible, but in no case later than the next regularly scheduled payday for such employee." *Id.* § 5 (West 2020).

¶ 60 Reading sections 2 and 5 together, as we must (*Hacker*, 2021 IL App (2d) 210050, ¶ 21), "[f]inal compensation under the *** Act is defined as wages, salaries, earned commissions and bonuses, earned vacation and holidays, and any other compensation owed pursuant to an agreement between the parties, that the employer must pay no later than the next regularly scheduled payday." (Internal quotation marks omitted.) *Schiller v. HomeServices of Illinois, LLC*, 2024 IL App (3d) 220405, ¶ 52; see *Majumdar*, 2013 IL App (1st) 130292, ¶ 17. Thus, if any such compensation cannot be determined as of the employee's next regularly scheduled payday after his or her separation, it is not final compensation under the Act. *McLaughlin v. Sternberg Lanterns, Inc.*, 395 Ill. App. 3d 536, 545 (2009); see *Schiller*, 2024 IL App (3d) 220405, ¶ 52 ("Final compensation payments must be determinable at the time of or very soon after separation."). As

16

*McLaughlin* recognized, any other construction of the term "final compensation" would render section 5 meaningless, because employers could not comply with section 5 if final compensation included amounts that became determinable only after the employee's next regularly scheduled payday. *Id.*; see *Hacker*, 2021 IL App (2d) 210050, ¶ 21 (courts must not construe statute in a manner which would render any part of it meaningless).

¶ 61        For the sake of analysis, we will assume the royalties fall within the "other compensation" language contained in section 2, that is, the royalties were "[r]emuneration [or payment] and other benefits received in return for services rendered." Black's Law Dictionary 354 (11th ed. 2019); see *id.* at 1550 (defining "remuneration" as "[p]ayment; compensation"). Indeed, the MOU identifies the royalties as "compensation." Nevertheless, Smith admitted that the royalties were not owed to her as of August 18, 2014. And the record shows the wind farm did not begin generating electricity until July 2015, nearly one year after Smith separated from her employment with Vision. Thus, the royalties claimed were not owed to Smith and could not have been paid by her next regularly scheduled payday, no matter how often she was paid. See 820 ILCS 115/3 (setting forth allowable pay periods: monthly, bi-monthly, bi-weekly, weekly, and daily). As such, the royalties claimed were not final compensation within the meaning of the Act, and the Act does not apply to Smith's claim.

¶ 62        Smith argues that this interpretation effectively nullifies section 4 of the Act. According to Smith, section 4, not section 5, governs the timing of payment of final compensation. We disagree.

¶ 63        Section 4 of the Act reads as follows:

   "All *wages* earned by any employee during a semi-monthly or bi-weekly pay period shall be paid to such employee not later than 13 days after the end of the pay period in which such wages were earned. All wages earned by any employee during a weekly pay

17

period shall be paid not later than 7 days after the end of the weekly pay period in which the wages were earned. All wages paid on a daily basis shall be paid insofar as possible on the same day the wages were earned, or not later in any event than 24 hours after the day on which the wages were earned. Wages of executive, administrative and professional employees *** may be paid on or before 21 calendar days after the period during which they are earned.

***

Any employee who is absent at the time fixed for payment, or who for any other reason is not paid at that time, shall be paid upon demand at any time within a period of 5 days after the time fixed for payment; and after the expiration of the 5 day period, payment shall be made upon 5 days demand. Payment to the absent employee shall be made by mail if the employee so requests in writing.

All *wages and final compensation* shall be paid in lawful money of the United States, by check, *** by deposit of funds in an account in a bank or other financial institution designated by the employee, or by a payroll card ***." (Emphasis added.) 820 ILCS 115/4 (West 2020).

To be sure, the third paragraph of the above-quoted portion of section 4 states that wages and final compensation must be paid in a certain manner. The remainder of section 4, however, makes clear that it governs the timing of the payment of wages, which are distinct from final compensation. Indeed, the text of section 5, quoted above, clearly states when an employer must pay final compensation—upon separation but in no case later than the employee's regularly scheduled payday. *Id.* § 5.

18

¶ 64     Smith also relies on several cases that she claims support her position that the royalties were subject to the Act. Two of those cases, *Hoke v. Abrams*, 2018 WL 776423 (N.D. Ill. 2018), and *In re Handy Andy Home Improvement Centers, Inc.*, 1997 WL 401583 (Bankr. N.D. Ill. 1997), are unreported federal cases. As such, they carry no authority before this court, and we decline to discuss or follow them. *State Farm Mutual Automobile Insurance Co. v. Progressive Northern Insurance Co.*, 2015 IL App (1st) 140447, ¶ 101; *Burnette v. Stroger*, 389 Ill. App. 3d 321, 329 (2009). The remaining cases on which Smith relies are distinguishable. See *Schultze v. ABN AMRO, Inc.*, 2017 IL App (1st) 162140; *McCleary v. Wells Fargo Securities, L.L.C.*, 2015 IL App (1st) 141287; and *Camillo v. Wal-Mart Stores, Inc.*, 221 Ill. App. 3d 614 (1991).

¶ 65     In *Schultze*, a case involving a bonus and severance pay, the issues were whether (1) there was an agreement, as that term is used in section 2 of the Act, between the employer and employee to pay a bonus; (2) the employer violated the Act when it changed the methodology used to calculate the bonus after the employee had earned a right to the bonus; and (3) the employer properly conditioned the receipt of severance pay on the employee's signing a release of his claim to the bonus. *Schultze*, 2017 IL App (1st) 162140, ¶¶ 23, 32-34. In *McLeary*, the issue was whether the employee had stated claim for a violation of the Act, where the employee alleged he was not paid a *pro rata* portion of a bonus under a bonus plan despite having qualified for one and the employer amended the plan after the employee's termination. *McCleary*, 2015 IL App (1st) 141287, ¶¶ 29-30. And in *Camillo*, the issue was the meaning of "earned bonus" as that term is used in section 2. *Camillo*, 221 Ill. App. 3d at 619. In none of these cases did the appellate court pass on the question presented here: whether final compensation includes royalties that did not become due to the employee until well after separation.

¶ 66　　　　Admittedly, as Smith points out, the bonuses at issue in *Schultze*, *McLeary*, and *Camillo* could not be determined as of the date of separation. However, each of the bonuses were *earned* at the time of separation. In this case, on the other hand, the royalties were not "earned" at the time of separation, as the wind farm was not yet generating revenue from which a royalty could be derived.

¶ 67　　　　Finally, we note that Smith takes issue with the circuit court's reliance on the 2007 IRS publication to support its finding that the royalties were not "earned" at the time of her separation from Vision. According to Smith, that publication had no relevance to the questions before the court. Further, she asserts, because Vision and Hunt do not offer any argument in support of the court's reasoning, we must hold that the court's order was erroneous.

¶ 68　　　　We are perplexed by the circuit court's reliance on the 2007 IRS publication, as neither party relied on it below and there is no apparent basis for its use in the context of the Act. However, we are not bound to review the circuit court's reasons for its judgment, and the fact the circuit court went off track in this regard is no reason to disturb its judgment, which was correct for the reasons set forth above. See *Reeder*, 2023 IL App (3d) 210361, ¶ 15.

¶ 69　　　　In sum, no royalties were owed to Smith at the time of her separation from Vision in August 2014. Thus, the royalties claimed are not final compensation within the meaning of the Act. Accordingly, we conclude the circuit court properly granted summary judgment to Vision and Hunt on Smith's wage claim.

¶ 70　　　　　　　　　　　　　　　　　III. CONCLUSION

¶ 71　　　　For the reasons stated, we affirm the judgment of the circuit court of Kankakee County.

¶ 72　　　　Affirmed.